**George JONES, Plaintiff–Appellee, Cross–Appellant,**

v.

**CITY OF CHICAGO, et al., Defendants–Appellants, Cross–Appellees.**

Nos. 87–2536, 88–1127.

United States Court of Appeals, Seventh Circuit.

Argued May 27, 1988.

Decided Sept. 14, 1988.

As Amended on Denial of Rehearing Nov. 15, 1988.

Ramsay Laing Klaff, Corp. Counsel, Chicago, Ill., for defendants-appellants, cross-appellees.

G. Flint Taylor, Peoples Law Office, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before POSNER, MANION, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

George Jones was arrested, jailed, and charged with murder and other crimes. After these charges were dropped, Jones sued the City of Chicago and several Chicago police officers and a police lab technician under 42 U.S.C. § 1983 for false arrest, false imprisonment, intentional infliction of emotional distress, and malicious prosecution, as well as conspiracy to commit these wrongs. He alleged that the defendants' conduct had denied him due process of law under the Fourteenth Amendment and violated his rights under the common law of Illinois. A jury awarded him $801,000 in compensatory and punitive damages. Judgment was entered on the verdict, and the defendants appeal. They argue that there was insufficient evidence of conspiracy; that they are insulated from liability by the decision of the state's attorney to charge and later to prosecute Jones, or at least are immune from liability for damages because they acted in good faith; and that the City cannot be held liable. Jones has cross-appealed, questioning the district court's calculation of attorney's fees.

The defendants have, as we shall see, no meritorious objections to the jury instructions; and they make only minor objections, also meritless, to the judge's trial rulings. So we must construe the evidence in the light most favorable to Jones, and this perspective discloses a frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself.

Between 4 and 6 a.m. on the morning of May 4, 1981, 12–year–old Sheila Pointer was raped, and bludgeoned to death, and her 10–year–old brother Purvy beaten unconscious, in their home in a poor neighborhood of Chicago. A blood-stained pipe was found in an alley behind the Pointer home. A neighbor, Nancy Coleman, reported seeing a black teenager, clad in a dark knee-length coat and a hat and carrying a red tote bag, leaving the alley at about 6 a.m.

The police had no other clues. Their only hope for breaking the case lay, therefore, with Purvy—who was in a coma. His doctors at the University of Chicago hospital told the police that it might be months before he could speak again, let alone remember anything about the assault. But Purvy's recovery proceeded more rapidly than expected. By May 11 he was able to speak (though only very hoarsely) and to respond to simple verbal cues. Police detectives Houtsma and Tosello—who are defendants in this case, as are all the police officers named in this opinion except Laverty—visited the hospital that day. Without first inquiring about Purvy's precarious mental state, they tried to interview him. Purvy found it difficult to speak, so the officers told him to signal "yes" or "no" by squeezing Houtsma's hand. After indicating in this manner that his parents (whom the police had briefly suspected) had not been the assailants, Purvy uttered the name "George." Through hand signals he conveyed the message that "George" was the assailant, and that George was a teenage gang member who lived near the Pointer home and had lighter skin than Purvy.

The detectives left the hospital and began looking for persons who lived near the Pointer home and fit the description of "George." They discovered that George Jones lived a block away. A senior at Fenger High School, and the editor of the school newspaper, the bespectacled Jones was called "Bookworm" by his classmates in grudging tribute to his studious character. He was the son of a Chicago policeman and planned to join the Air Force upon graduation from high school and afterward attend college.

The police obtained a photograph of George—his graduation photograph, which showed him in a suit—from his father, and gathered some other photos in order to prepare a photo line-up for Purvy. The other photos were mug shots.

Their shift ending, Houtsma and Tosello left the sheaf of photos for the detectives on the next shift, Kelly and Binkowsi, who that evening took the photos to show Purvy. Earlier that day Purvy had overheard a doctor ask a nurse, "Is that the boy whose sister is dead?" Upon thus learning that his sister was dead, Purvy became agitated. The officers knew this, but proceeded with the photo line-up. Officer Kelly displayed George Jones's picture and asked Purvy whether he knew the person in it. He said yes, and Kelly then asked him whether this person was the assailant. Purvy did not respond. Kelly showed him the rest of the pictures but Purvy remained unresponsive. Eventually he started crying, and the officers left.

Just before the interview, Mrs. Pointer had told Kelly that Purvy had been murmuring a name that sounded like "George Anderson," "George Henderson," or "George Harrison"—and, sure enough, during the interview Kelly and Binkowski heard Purvy repeat a name that sounded like "Anderson." So when they left the hospital they tried to find an "Anderson" in the Pointer neighborhood, but they were unsuccessful. They returned to the police station and wrote a memorandum accurately describing their interview with Purvy. Kelly gave copies of this memorandum to the other police officers investigating the case and to the sergeant on duty. He placed the remaining copy not in the police department's regular files but in its "street files." These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files. As a result, the street files were not available to defense counsel even if they contained exculpatory material. We use the past tense because the practice was discontinued following a class-action suit (inspired by the disclosure, in the criminal trial of George Jones, of the existence of the street files) to enjoin the practice.

That suit is *Palmer v. City of Chicago*, the essential orders in which are reported at 562 F.Supp 1067 (N.D.Ill.1983), 755 F.2d 560 (7th Cir.1985), and 806 F.2d 1316 (7th Cir.1986). It ended without a formal ruling on the lawfulness of the practice.

The next morning (May 12), Houtsma, accompanied by Detective McGuire, went to the hospital and repeated the photo line-up. Houtsma showed Purvy the pictures one at a time, starting with George Jones's picture. Purvy made no response to it but upon seeing one of the subsequent pictures cried out "Yep, yep, that's the one who did it to me." Houtsma asked Purvy whether he knew the person's name; he made no response. He also made no response when Houtsma asked him whether he knew the person's nickname and whether it was "Bookworm."

Houtsma and McGuire left the hospital. Accompanied by officers McCabe and McNally, they went directly to Jones's high school. They sent uniformed police officers into his classroom who arrested him. They searched his locker but did not find the clothes or bag matching Nancy Coleman's description. They took him to the police station, where they questioned him and threatened him with the electric chair if he didn't confess. He denied having anything to do with the crime and was packed off to Cook County Jail after a night in a police lockup.

McCabe and McNally took George's graduation photo to Nancy Coleman, who at first was uncertain but after covering up part of the face with strips of paper said he was indeed the "clean looking" person she had seen emerging from the alley on the morning of the crime.

An assistant state's attorney suggested that an attempt be made to get Purvy to identify Jones in person as the assailant. Accompanied by two assistant state's attorneys, Houtsma and McCabe brought George Jones to Purvy's hospital room, ordered him to stand about three and a half feet from the bed, and asked Purvy whether this was the person who had hit him over the head. Speaking calmly, Purvy answered, "No, that's not the man, that's

not the man, no, no, no." Houtsma ordered Jones to take off his glasses and stand within two feet of Purvy. Houtsma turned up the lights, then repeated the question. "No," said Purvy—then, "Yes, that's him, yes"; then, "Yes, no, yes, no" over and over. Someone asked Purvy whether he was sure (of what?) and Purvy answered with another string of yes-nos. One of the assistant state's attorneys present, Schultz, testified in this case that Purvy's identification of George Jones was the best identification he had ever seen. Such testimony could not have helped the defendants' credibility with the jury.

The morning after this "identification," a grand jury indicted George Jones for murder, rape, attempted murder, armed violence, burglary, and home invasion. On the same day (May 13), Sergeant Palmer signed the official arrest report. A document intended for use by prosecutors, this report had been compiled the previous day by Tosello, Houtsma, McCabe, McGuire, and McNally, and signed by the first two. The report was full of falsehoods, such as that Nancy Coleman had picked out Jones's picture from a group of seven (his picture was the only one she had been shown), that Jones's father had not seen him on the morning of May 4 (in fact his father had told the investigating officers that he had seen George at home that morning), and that Purvy had said that his assailant attended Fenger High School (Purvy had said no such thing). The report did not mention that Purvy had described his assailant as a gang member (George Jones was not a gang member), as being a lighter-skinned black than Purvy (George Jones is darker-skinned than Purvy), and as having a name like Anderson. The report also did not mention that the doctors had warned the officers at least twice that Purvy's head injury had left him with serious memory problems.

The state's attorney's office used this report to persuade the court to set George Jones's bond at $250,000, an amount his family could not raise—so George was returned to Cook County Jail. While there he had to fight off a rape attempt, was beaten up by gang members, and was forced to join a gang for self-protection, a process that included a brutal initiation rite. After a month of these horrors the court reduced the bond to an amount the Jones family could afford, and George was released.

On May 18 there was a new development in the case. Mrs. Pointer reported to the police that she had found two pairs of pantyhose in her house that belonged neither to her nor to her murdered daughter. Detective Laverty was assigned to investigate this new evidence, Houtsma and Tosello having gone on leave. Laverty went to Purvy, who was still in the hospital, and asked him what he knew about the pantyhose. Purvy said for the first time that there had been two assailants and that both had worn stocking masks. Purvy referred to one of the assailants as George Anderson and to the other as "twin brother George." He reiterated that George Anderson was a gang member. Laverty asked Purvy how he knew that one of the assailants had been George Anderson when both had worn masks. Purvy broke down and cried.

Laverty went to Commander Deas, the head of the area detective division, described to him and Sergeant Palmer Purvy's responses, and told him he was convinced the wrong person had been charged. Deas told Laverty to continue investigating but took no other action.

Houtsma and Tosello returned from leave, learned of Laverty's discoveries, and went to the hospital to interview Purvy yet again. Purvy repeated that there had been two assailants, both masked. But this time Purvy added that one of them had removed his mask during the assault. He was not asked to describe that assailant.

Houtsma and Tosello confronted Laverty. They were furious. They told him that he was messing up their case, and threatened to destroy his career if he continued to "interfere." They assured Laverty that Purvy had identified George Jones and that Jones was guilty. Laverty said that if the case went to trial he might testify for

Jones; Tosello threatened to "blow him away" if he did.

Laverty prepared an official report, but it was not submitted, because Houtsma took it away and rewrote it. The rewritten report omitted any reference to Laverty and concluded that no further investigation was warranted. Laverty then wrote up his interview with Purvy and deposited it in the street files.

In July, 21–year–old Sharon Hudson was raped, and bludgeoned to death, four blocks from the Pointer home. Lester Pique was arrested, and confessed to the crime. Laverty thought Pique matched Purvy's description of his attacker: Pique went by the name "King George," was a gang member, and had lighter skin than Purvy. Questioned by Laverty about the Pointer crime, Pique said that it was possible he had committed it, but that as he had frequent blackouts he wasn't sure. Laverty reported this information to Lieutenant Griffith, who was the head of the violent crimes unit of the area detective division, and asked Griffith to arrange for Purvy to view a line-up with Pique in it. Griffith refused on the sound but surprising ground that Purvy was not competent to make an identification, falsely implying that because of Purvy's incompetence the prosecution of Jones had been abandoned. Laverty opined to Deas that Pique, not Jones, had committed the Pointer crime. The report was never forwarded to the state's attorney's office.

In October, with preparations for the trial of Jones proceeding at full tilt, police laboratory technician Mary Furlong, who is also a defendant in this case, discovered that George Jones had different semen and blood types from the types found in Sheila Pointer's vagina. Furlong failed to include this information in the lab report that she was preparing for the prosecution of Jones. After being confronted with this omission, she submitted a new report that contained the results of the blood and semen tests. And she placed in the Sharon Hudson file, but not in the Pointer file, the results of an examination of hair taken from the pantyhose that Mrs. Pointer had discovered.

This examination indicated that one of the hairs found was not Jones's but might be Pique's. The other hairs found in the pantyhose could not be tested.

Also in October, Deas asked Laverty to write a memo setting forth all he knew about the Pointer case. Laverty complied. Deas put the memo in his desk drawer and it stayed there.

The spring of 1982 arrived and the trial against George Jones began. A newspaper carried a report of the trial. Laverty read it with astonishment; Griffith had told him that the prosecution had been abandoned. Laverty went to Deas and asked him why an innocent person was being prosecuted. Deas replied that if Jones was innocent, the jury would acquit him. After calling the court where Jones was on trial and being referred to counsel, Laverty told Jones's lawyer about the exculpatory information secreted in the "street files." The lawyer promptly relayed Laverty's disclosures to the judge, who declared a mistrial. Shortly afterward the state's attorney dropped all charges against Jones. No apology was ever made to Jones, and neither the City nor the state offered to compensate him for his ordeal.

The Pointer crime has never been solved. Purvy, although declared "legally unavailable" to testify at the trial of George Jones's civil rights suit (implying that he was mentally incompetent), has recovered from his head injury and is today a sophomore in high school. Although another panel of this court has said that Laverty should have been commended "for his adherence to the principles of honesty, decency, and justice," *Palmer v. City of Chicago, supra,* 755 F.2d at 564 n. 3, instead the police department charged him with a disciplinary infraction for having failed to advise the state's attorney that he planned to testify for the defense in George Jones's criminal trial should that become necessary. He was also transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples. None of the defendants has been disciplined for mis-

conduct in the arrest and prosecution of George Jones.

The defendants do not quarrel with the propositions that to arrest a person without probable cause, or to prosecute a person when there is no reasonable ground for believing that he committed a crime, or to do both things to the same person, violates both the Constitution and the common law, and that the victim of such official misconduct is entitled to recover all damages flowing from it. These concessions make it unnecessary for us to examine the difficult question whether malicious prosecution can ever count as a deprivation of liberty without due process of law when the defendant is not imprisoned (recall that George Jones was let out on bail a month after his initial arrest). *Hand v. Gary*, 838 F.2d 1420 (5th Cir.1988), answers this question "yes," but it is an open one in this circuit, see *Tarkowski v. County of Lake*, 775 F.2d 173 (7th Cir.1985). It is not an issue in this appeal.

The defendants do, however, argue that George Jones failed to prove a conspiracy. Conspiracy is a more familiar doctrine in criminal than in civil cases, except under statutes such as the Sherman Act and RICO that provide both criminal and civil sanctions for the same conspiracies. In a tort case such as this (a section 1983 constitutional-tort case is still a tort case, and Jones's pendent claims charge garden-variety common law torts), the function of conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the complaint. The requirements for establishing participation in a conspiracy are the same, however, as in a case (criminal or civil) in which conspiracy is a substantive wrong. See *Hartford Accident & Indemnity Co. v. Sullivan*, 846 F.2d 377, 383 (7th Cir.1988).

To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them.

See, e.g., *id.* at 383–85; *Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir. 1984); *United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir.1944) (L. Hand, J.). Beyond this, attempts at definition will not help.

We cannot say that the jury acted unreasonably in finding that all of the individual defendants were voluntary participants in a common venture to railroad George Jones.

The least extensive participations were those of the supervisory officers (Deas, Griffith, and Palmer) and of the lab technician (Furlong). There is no principle of superiors' liability, either in tort law generally or in the law of constitutional torts. See, e.g., *Riordan v. Kempiners*, 831 F.2d 690, 695 (7th Cir.1987); *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 967 (7th Cir.1986); *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1390 (7th Cir.1984). To be held liable for conduct of their subordinates, supervisors must have been personally involved in that conduct. See, e.g., *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir.1986); *Duckworth v. Franzen*, 780 F.2d 645, 651 (7th Cir.1985); *McKinnon v. City of Berwyn, supra*, 750 F.2d at 1391; *Wilson v. City of North Little Rock*, 801 F.2d 316, 322–23 (8th Cir.1986); *Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir.1986); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir.1985). That is a vague standard. We can make it more precise by noting that supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable, because negligence is no longer culpable under section 1983. See *Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986); *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Wilson v. City of North Little Rock, supra*, 801 F.2d at 322 n. 3. Gross negligence is not enough either. The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliber-

ate, reckless indifference. Cf. *Duckworth v. Franzen, supra,* 780 F.2d at 652–53; *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985); *Slakan v. Porter,* 737 F.2d 368, 373–75 (4th Cir.1984). This heavy burden on plaintiffs is easy to understand in a case such as this case where the ground of the supervisors' liability is that they conspired with subordinates to violate the plaintiff's constitutional rights. There is no such thing as accidental or inadvertent participation in a conspiracy. There was, however, enough evidence to enable the jury to infer that Deas, Griffith, and Palmer had known every false step taken by the subordinate officers, had approved every false step, and had done their part to make the scheme work—by deep-sixing Laverty's report (Deas), by trying to put Laverty off the scent (Griffith), and by signing a deceitful report for use by the prosecution (Palmer).

Furlong testified that it was only through inadvertence that she left out of her lab report information that would have exculpated George Jones and inculpated Lester Pique. The jury was not required to believe her, especially given the evidence that she had talked to Houtsma several times by phone and that she had originally planned to file the hair study in the Pointer file but had later altered the file number to that of Sharon Hudson. The jury was entitled to conclude that Furlong, like the three supervisory officers, had for whatever reason decided to help the officers, centrally Houtsma and Tosello, who were determined to put away George Jones regardless of the evidence. They had a hunch he was guilty and were not going to let a mere absence of evidence stand in their way.

■ The defendants point out that the state's attorney, who neither is nor could be a defendant, see *Imber v. Pachtman,* 424 U.S. 409, 427–28, 96 S.Ct. 984, 993–94, 47 L.Ed.2d 128 (1976), decided to prosecute George Jones, and they argue that all of Jones's woes flow from that decision and not from their conduct. It is true that two assistant state's attorneys were present when Purvy made his dubious identification of George Jones and that Jones's claim for damages is based largely (though not entirely) on the time he spent in jail after the bond hearing, which is to say after the state's attorney had decided to prosecute him, and, later still, on the distress he suffered while awaiting and then while undergoing trial. It is also true, as a matter of elementary principles of legal causation that are as applicable to constitutional torts as to common law torts, cf. *Parrett v. City of Connersville,* 737 F.2d 690, 695 (7th Cir.1984); *Taliferro v. Augle,* 757 F.2d 157, 161–62 (7th Cir.1985)—and both types are charged in this case—that if George Jones would have been prosecuted even if the defendants had behaved properly, then they did not cause his injury and are not liable. But the jury could find that the defendants systematically concealed from the prosecutors, and misrepresented to them, facts highly material to—that is, facts likely to influence—the decision whether to prosecute Jones and whether (that decision having been made) to continue prosecuting him right up to and into trial. If the prosecutors had known of Laverty's evidence, they would almost certainly have dropped the charges against Jones before trial. Indeed, he might never have been charged in the first place if the prosecutors had known the facts militating against Jones's guilt, including the fact that Purvy's description did not fit him and that Purvy initially had failed to identffy him as the assailant. The jury was entitled to find that had it not been for the misconduct of the defendants, Jones would neither have been arrested nor charged. Cf. *Dellums v. Powell,* 566 F.2d 167, 192–93 (D.C.Cir.1977).

■ In constitutional-tort cases as in other cases, "a man [is] responsible for the natural consequences of his actions." *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). This principle led the Supreme Court in *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), to hold that the issuance of an arrest warrant will not shield the police officer who applied for the warrant from liability for false arrest if "a reasonably well-trained officer in [his] posi-

tion would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Id.* at 345, 106 S.Ct. at 1098 (footnote omitted). The Court was speaking of immunity but its discussion is equally relevant to causation, as indeed is implied in a footnote to the Court's opinion. See *id.* at 344 n. 7, 106 S.Ct. at 1098 n. 7. By parallel reasoning, a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision. See, e.g., *Myers v. Morris,* 810 F.2d 1437, 1457 (8th Cir.1987); *Hand v. Gary, supra; Smiddy v. Varney,* 665 F.2d 261, 266–67 (9th Cir. 1981); *Dellums v. Powell, supra,* 566 F.2d at 192–94; *Ames v. United States,* 600 F.2d 183, 185 (8th Cir.1979) (dictum); cf. *McLaughlin v. Alban,* 775 F.2d 389 (D.C. Cir.1985) (per curiam).

■ It is true that at some point after a person is arrested, the question whether his continued confinement or prosecution is unconstitutional passes over from the Fourth Amendment to the due process clause (and after conviction to the Eighth Amendment's cruel and unusual punishments clause, but that is not relevant here). See *Johnson v. Glick,* 481 F.2d 1028, 1032 (2d Cir.1973) (Friendly, J.); *Lynch v. Cannatella,* 810 F.2d 1363, 1375 (5th Cir.1987); cf. *Justice v. Dennis,* 834 F.2d 380, 382 (4th Cir.1987) (en banc); *Williams v. Mussomelli,* 722 F.2d 1130, 1133 (3d Cir.1983). But the causal inquiry is unchanged. If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded.

■ The defendants' alternative argument is that they are immune from liability for damages because they were acting in the good-faith discharge of their public office. The "good faith" immunity of public officers from constitutional tort liability is now a misnomer; ever since *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), it is forfeited not by showing that the officer was acting in bad faith but by showing that he was violating an established constitutional principle. The application of this concept to arrests was uncertain until *Malley v. Briggs.* The test of *Harlow* was designed for cases where the law has changed, and so might be thought to imply that there can be no immunity for making an arrest without probable cause, because that is not a new standard. *Malley,* however, created room for an immunity defense even in cases where there was no probable cause for the arrest, by holding that "if officers of reasonable competence could disagree" on whether there was probable cause, the defendant would be immune from damages liability. See 475 U.S. at 341, 106 S.Ct. at 1096. To the same effect see *BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir.1986). In other words, only if no reasonable officer could have mistakenly believed that he had probable cause to arrest is the immunity forfeited. Unaffected by *Malley* is the teaching of *Harlow* that an arrest pursuant to a valid warrant is not actionable in a suit for damages under section 1983 even if the officers who procured or executed the warrant were acting maliciously, although they may be liable under state law for the common law tort of malicious prosecution. *Wheeler v. Cosden Oil & Chemical Co.,* 744 F.2d 1131 (5th Cir.1984).

■ Who decides the immunity question when facts pertinent to it are in dispute—judge or jury? See *McGaughey v. City of Chicago,* 664 F.Supp. 1131, 1139 (N.D.Ill.1987). The cases in this circuit go both ways, but our most recent and only en banc decision on the question states that the judge should always decide the issue of immunity. See *Rakovich v. Wade,* 850 F.2d 1180, 1201–02 (7th Cir.1988). That is what was done here, without objection by either party. The judge submitted the issue of probable cause to the jury and then after the jury returned its verdict made his own determination on immunity. A jury might be confused if it had to decide not

only whether the defendants had probable cause but also whether, even if not, reasonable officers in their position *could* have thought they had probable cause. Sensible or not, the procedure followed here was not objected to, and is not at issue in this appeal. The issue rather is whether the district judge committed a clear error in finding that no "reasonable officer in like circumstances would have acted as the defendants did," *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988).

The judge did not commit an error, clear or otherwise. The facts show conduct that no reasonable police officer would have engaged in. Although Houtsma and Tosello would have had probable cause to arrest George Jones if (1) a lucid Purvy had (2) identified Jones as the assailant, *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432 (7th Cir.1986); *Clay v. Conlee*, 815 F.2d 1164, 1168–69 (8th Cir.1987), a reasonable trier of fact could find that Purvy had not identified Jones until Jones was brought to Purvy's hospital room, *after* having been arrested. Yet if the only defect in the arrest had been the timing of the identification, the defendants could argue strongly that Jones's damages should be limited to the period between the arrest and the identification; that while a reasonable officer might not have arrested Jones *when* these officers did, a reasonable officer would not have advised the prosecution to drop charges after the victim had identified Jones. Cf. *BeVier v. Hucal, supra*, 806 F.2d at 128; *Thompson v. Olson*, 798 F.2d 552 (1st Cir.1986); *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1359 (7th Cir.1985) (concurring opinion). But Purvy's momentary identification of Jones—equivocal, made in suggestive circumstances by a child with a severe head injury, and quickly withdrawn—was worthless. It brings to mind our warning in *Gramenos* that "a 'prudent' officer may balk if the person claiming to be an eyewitness strolls into the police station and describes a crime from long ago, *or if the person leveling the accusation is babbling or inconsistent.*" 797 F.2d at 439 (emphasis added). Nancy Coleman's identification also came after the arrest, and also was worthless.

■■■ So much for the individual defendants. The City of Chicago is liable to Jones under section 1983 if a custom or policy of the City was a cause of the plaintiff's injury. See *Monell v. Department of Social Services*, 436 U.S. 658, 690–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The issue has little, probably no, practical significance. No damages were awarded against the City that were not also awarded on a joint and several basis against the individual defendants; and since the City indemnifies its employees for damage awards made against them in respect of the torts they commit in the course of their employment, Jones will collect his judgment in full whether or not the City is held liable.

■■ The custom in question is the maintenance of the "street files," police files withheld from the state's attorney and therefore unavailable as a source of exculpatory information that might induce him not to prosecute or, failing that, would at least be available to defense counsel under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As we noted recently, information undermining the credibility of a government witness is within the scope of *Brady's* rule. See *United States v. Herrera–Medina*, 853 F.2d 564, 567 (7th Cir. 1988). Although the lawfulness of the street-files practice has never been adjudicated, the City, which has abandoned the practice, does not challenge the jury's implicit finding that it denied criminal defendants due process of law. *Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated. The City sensibly does not attempt to defend such behavior in this court.

■■ There is little doubt that the clandestine character of the street files played a role in Jones's misfortunes. Cf. *Harris v. City of Pagedale*, 821 F.2d 499, 507 (8th Cir.1987). If the state's attorney had had

access to them, he would have discovered memos by Kelly and especially by Laverty that would have given any prosecutor pause. Alternatively, defense counsel would have obtained them prior to trial and the trial would have ended even sooner than it did. The only question is whether this custom was a custom of the City of Chicago. As the custom was department-wide and of long standing, the jury was entitled to conclude that it had been consciously approved at the highest policy-making level for decisions involving the police department—the standard suggested by the recent plurality opinion in *City of St. Louis v. Praprotnik*, — U.S. —, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). See also *Stokes v. Bullins*, 844 F.2d 269, 273 (5th Cir.1988).

Before turning to the cross-appeal, we shall take a moment to discuss the defendants' objections to the jury instructions. They are shallow.

1. The judge refused a requested instruction that the jury could not base liability on the defendants' conducting an unduly suggestive line-up. The plaintiff had never sought to impose liability on that basis, but had merely argued that the suggestiveness of the identification procedures used by the defendants vitiated the "identifications" of Jones by Purvy and by Nancy Coleman as grounds for probable cause to detain him.

2. The defendants were refused an instruction that they had no duty to continue investigating once probable cause had been established. But that assumed that probable cause *has* been established; it never was.

3. The defendants objected to an instruction that they say allowed the jury to award damages for a violation of the principle of *Brady v. Maryland.* The instructions that were given did no such thing, so we do not reach the question whether damages could ever be awarded for such a violation.

4. The defendants were refused an instruction that probable cause is an absolute defense to an action for false arrest, but the instructions that were given made clear that liability for false arrest

indeed depends on an absence of probable cause.

5. The defendants wanted an instruction that the decision by the prosecutor to charge Jones broke the causal chain between the conduct of the defendant officers and the injury to Jones. The instruction was properly refused; as we have seen, the defendants' causal argument is unsound.

We turn to the plaintiff's cross-appeal, which challenges the adequacy of the attorney's fee award. The plaintiff claims that the district court erred by (1) using the contingency-fee contract between him and his lawyer to place a ceiling on the attorney's fees and (2) deducting from the award all fees allocable to the state-law claims. The defendants do not defend the award, which indeed is indefensible, see, e.g., *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Aubin v. Fudala*, 782 F.2d 287, 291 (1st Cir.1986). They merely point out that-of course—if the decision on the merits is affirmed the fee award must be redetermined in accordance with the correct principles. We accept this concession and reverse the fee order. We affirm the judgment on the merits.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.