**Angela CHONTOS, Plaintiff,**

v.

**Harold RHEA; Indiana University; and the Trustees of Indiana University, Defendants.**

**No. 2:97–CV–423–RL.**

United States District Court, N.D. Indiana, Hammond Division.

Nov. 16, 1998.

Barry D. Sherman, Kristen D. Hill, Sherman and Allegretti, Hammond, IN, Kenneth L. Fugate, Young and Fugate, Gary, IN, for Plaintiff.

Robert M. Schwerd, Hilbrich Cunningham and Schwerd, Highland, IN, David C. Jensen, Sherry L. Clarke—Eichhorn & Eichhorn, Hammond, IN, for Defendants.

### ORDER

LOZANO, District Judge.

This matter is before the Court on Indiana University's Motion for Summary Judgment, filed on September 2, 1998, and the Motion for Leave to File Affidavit of Charles Burns, filed by Defendants on November 6, 1998. For the reasons set forth below, Indiana University's Motion for Summary Judgment is **DENIED**, and the Motion for Leave to File Affidavit of Charles Burns is **GRANTED**.

### INTRODUCTION

Taken in the light most favorable to the Plaintiff, the evidence in this case shows that an Indiana University professor, Harold Rhea, forcibly kissed and fondled Angela Chontos, his student, during a private conference in his office in May 1996. Rhea had made unwelcome advances to female students in the past, and the university had taken some corrective steps to curb Rhea's behavior. Before the Court is the universi-

ty's[1] motion for summary judgment, which raises the question whether Chontos can prove that despite the corrective steps, the university's handling of Rhea's behavior amounted to the "deliberate indifference" required to recover under Title IX of the Education Amendments of 1972, codified at 20 U.S.C. section 1681, *et seq.* The Court concludes that summary judgment is not appropriate.

### DISCUSSION

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *NUCOR Corp. v. Aceros Y Maquilas de Occidente,* 28 F.3d 572, 583 (7th Cir.1994).

▮ Title IX generally prohibits sex discrimination by educational programs or activities that receive federal financial assistance. 20 U.S.C. § 1681(a); *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, ——, 118 S.Ct. 1989, 1994, 141 L.Ed.2d 277 (1998). The agencies that distribute educational funds can enforce this prohibition through means such as cutting off funds. *Gebser,* 524 U.S. at ——, 118 S.Ct. at 1994. The relationship between agencies and funds recipients is contractual in nature, with the agency conditioning funding on the recipient complying with the ban on sex discrimination. *Id.* at 1997. Besides agency enforcement, Title IX

---

1. Indiana University and the Trustees of Indiana University, nominal separate Defendants here, will be referred to as "the university" in this order.

is "enforceable through an implied private right of action" for damages. *Id.* at 1994.

■ *Gebser* recently established the test for a student to recover from a school for a teacher's sexual harassment under Title IX. Absent the school having an official policy of discrimination, the student must prove that a school "official ... who at a minimum has authority to institute corrective measures on the [school's] behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Id.* at 1993, 1999.

Chontos charges that the university violated Title IX by not responding adequately to Rhea's pattern of sexually harassing students. The university's motion does not contest that proper officials had actual notice of Rhea's behavior, but it does argue that Chontos cannot prove the officials were deliberately indifferent to the behavior.

■ What constitutes "deliberate indifference" in the Title IX context is thus crucial here. *Gebser* did not apply the term to the facts in that case. However, the opinion does note that under the administrative enforcement scheme, an agency may sanction a funds recipient when the proper official "refuses to take action," in other words, when there is "an official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at ——, 118 S.Ct. at 1999. According to *Gebser*, this "framework finds a rough parallel in the standard of deliberate indifference." *Id.* In a case cited by *Gebser* where the plaintiff complained that a county's decision to hire a police officer caused her to be subjected to excessive force, the Supreme Court described deliberate indifference as an official's "consciously disregard[ing] an obvious risk that [another] would subsequently inflict a particular" injury. *Bd. of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 1391–92, 137 L.Ed.2d 626 (1997).

The Seventh Circuit has not yet applied the *Gebser* standard, but in a pre-*Gebser* case adopted a standard that seems about as stringent as deliberate indifference. *Smith v. Metropolitan School Dist. of Perry Township*, 128 F.3d 1014, 1034 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998). Adopting the Fifth Circuit's view, the *Smith* court announced that a school can be liable under Title IX for teacher-student sexual harassment only if a proper school official with "actual knowledge of the abuse" and "the power to take action that would end such abuse ... failed to do so." *Id.* (quoting *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir.1997)). In the context of a section 1983 claim, the Seventh Circuit has described deliberate indifference as occurring when officials "know about the [wrongful] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (1988).

In a case that came after *Smith* but still before *Gebser,* the Seventh Circuit stressed that officials who attempt to stop harassment yet ultimately fail are not necessarily liable under Title IX:

> School officials faced with knowledge of sexual harassment must decide how to respond, but their choice is not a binary one between an obviously appropriate solution and no action at all. Rather, officials must choose from a range of responses. As long as the responsive strategy chosen is one plausibly directed toward putting an end to the known harassment, courts should not second-guess the professional judgments of school officials. In general terms, it should be enough to avoid Title IX liability if school officials investigate aggressively all complaints of sexual harassment and respond consistently and meaningfully when those complaints are found to have merit.

*Doe v. Univ. of Illinois,* 138 F.3d 653, 667–68 (7th Cir.1998). Although they preceded *Gebser,* these comments in *Doe* bear keeping in mind today because of the *Gebser*-like standard the Seventh Circuit was acting under in *Doe* and *Smith.*

Here, the facts taken in the light most favorable to Chontos are as follows: Rhea was a tenured associate professor at Indiana University (Northwest) in the department of physical education and recreation. He was heavily involved in intramural athletics. He received consistently positive reviews for his teaching and service to the campus and community.

Rhea was involved in two incidents with female students in 1989. First, a graduate student, "RJ", reported that Rhea repeatedly asked her for lunch dates and called her at home, offered to obtain a copy of an upcoming test for her, wrote a note expressing his romantic feelings for her on the back of her class worksheet, and repeatedly showed up at her house unannounced and uninvited. One night, Rhea went to RJ's home and told her that he "couldn't take it any longer" and had to hold and kiss her. Rhea then grabbed RJ, pulled her to him, and tried to kiss her. After they struggled, Rhea let go and left.

RJ stopped going to Rhea's class and reported his conduct to university officials. Rhea's supervisor, Lewis Ciminillo, the dean of the division of education, confronted Rhea about RJ's allegations, which Rhea essentially confirmed. Ciminillo upbraided Rhea for his behavior and told him it violated university policy. Ciminillo also removed RJ from Rhea's class and put her in a separate section that he supervised, telling RJ that he would try to take care of the problem without causing her to have further contact with Rhea.

Ciminillo recommended that Rhea receive a reprimand. Lloyd Rowe, the vice-chancellor for academic affairs, concurred with Ciminillo's recommendation and Rhea received a written reprimand. No further action against Rhea was taken at this time, but Ciminillo told Rhea that if he behaved similarly in the future, he could be punished more severely up to being fired.

Later that same year, another incident occurred involving "TR," a seventeen-year-old high school student in the university's "Career Beginnings" program. TR reported that while she was talking on a pay phone, Rhea approached and asked her who she was speaking with. TR said "My friend." Rhea asked, "Your boyfriend?" TR said, "Yes." Rhea said, "O.K." then swatted TR on the buttocks with his hand. Rhea left, but then came back and asked TR how long she would be on the phone. When she finished her call, TR approached Rhea in the lounge to tell him that the phone was free, thinking he wanted to use it. Rhea said he did not want to use the phone, but wanted to talk to her. Rhea started walking and TR followed while they had a conversation about sports. TR asked where they were going, and Rhea indicated to his office where it would be more convenient. TR said she did not want to go to his office. Rhea said the office would be more convenient and comfortable. TR then left Rhea and went back to her own office. She ran into Rhea later that afternoon, who said that he had not been trying to scare her, only to be nice. TR did not respond and went back to her office. Rhea later claimed that he had touched TR only in passing, but did not otherwise deny the incident happened.

Linda Anderson, the director of student activities, her supervisor, Barbara Cope, the vice-chancellor of student activities, Ciminillo, and Rowe all learned of the TR incident. Ciminillo recommend that Rhea get psychological counseling, with reports on the progress on the counseling made to the university. Rowe agreed. Through the campus psychologist, Rhea was referred to and saw a psychiatrist for seven sessions. Rhea was supposed to execute releases to allow the psychiatrist to report on his progress to the university, but he never did so and the university never followed up with him on the release. Ultimately, the university learned that Rhea had seen the psychiatrist, but other than that, the university did not seek or obtain any more information regarding the results of Rhea's counseling. Rhea was not disciplined for the TR incident. In particular, Ciminillo did not follow through on his warning after the RJ incident that Rhea might be fired for sexually harassing students again. Rowe, however, did write a letter to Rhea saying that if he was involved in another incident of sexual harassment, the university would have no choice but to move to suspend and fire him. Despite having claimed he touched TR only in passing, Rhea effectively admitted the truth of TR's story in a letter he wrote Rowe in September 1989.

In the two years or so prior to the TR incident, three or four female students had told Anderson that Rhea made them feel uncomfortable. Anderson did not formally report these comments, consistent with the students' wishes. After the TR incident, Anderson adjusted schedules and furniture

to avoid situations where Rhea worked close to females in the student activities office. In addition, she wrote a memo to Cope and Ciminillo informing them of the reports from students that Rhea made them uncomfortable and her having rearranged the office, and asking that Rhea be removed from the student activities department. Cope and Ciminillo agreed, and Rhea was removed, which ended his involvement in intramural athletics.

By the time of the TR incident or shortly thereafter, Ciminillo knew that many females were uncomfortable when Rhea was around. Women did not want Rhea walking behind them and did not like having to worry about who else was around when Rhea was near. Some female students would not take classes taught by Rhea because he tended to become overly familiar. Rhea would inappropriately pat women on the buttocks after they made a good play during sports activities. Women who were in positions subordinate to Rhea, like students, were the most uncomfortable. Ciminillo believed that Rhea used his power and sexual· overtones to make women feel uncomfortable.

The documents relating to the RJ and TR incidents were placed in a sealed envelope in Rhea's personnel file. Most faculty and administrators did not know about the envelope and the RJ and TR incidents.

About five years went by without further incident. Then, in spring 1994, Anderson learned that Rhea had made advances toward a female student, "RK." During class, Rhea said to RK that he had heard her father owned a body shop. Rhea then looked RK up and down and said, "He sure knows how to make good bodies." Rhea also put his arm around RK a few times. Anderson spoke to RK, who said that she did not want to formally report the conduct (although she eventually did so after the Chontos incident). Anderson says that acting as a friend, she told Rhea he better "clean up his act" even though she was no longer his supervisor by then. Rhea denies this. Anderson told no one else about the incident. Anderson knew that Rhea had been asked to have counseling after the TR incident and that his file had been sealed, but she did not know that he had been threatened with being fired if he sexually harassed females again.

Also in 1994, Mary Harris Veeder took over Rowe's position. Rowe told her that there was a sealed envelope in Rhea's file that should be opened if Rhea were ever in any trouble. Veeder knew nothing else about the contents of the envelope until she opened it after the Chontos incident.

In May 1996, Chontos was a student of Rhea. She went to his office to make a graded presentation. Rhea had been relaxing some academic requirements for Chontos because she was having difficulty in her personal life. After Chontos finished the presentation, Rhea forcibly grabbed her. He tried to kiss her on the mouth and put his tongue in her mouth. He pulled up her shirt and bra, grabbed at her breasts, and put his mouth on them. He grabbed her buttocks and started moving his hand around to her genitals. Chontos repeatedly told him to stop and pushed herself away. Rhea apologized and said it would not do any good to report him because she was not technically his student. Later that day, Rhea gave Chontos an "A" for her semester grade.

About a month after the Chontos incident, Rhea was suspended and told to stay off campus unless he arranged for an escort. Veeder and Hilda Richards, the university chancellor, requested that the faculty meet to discuss whether to institute proceedings to dismiss Rhea. In January 1997, a faculty committee recommended such proceedings, after which Richards gave Rhea the option of resigning with full benefits. Rhea chose this option and resigned, effective August 1997. Chontos initiated the suit about four months later.

During all times relevant to this lawsuit, the university maintained a policy against sexual harassment of students and employees. Victims of harassment were informed that they should report it to their supervisor, an academic or student services dean or official, and/or the campus affirmative action officer.

The student body was never informed that Rhea had sexually harassed students or that he had been reprimanded for doing so.

■ On these facts, a reasonable jury could find that the university was deliberate-

ly indifferent. By the end of 1989, Rhea had (1) gained a reputation for making females uncomfortable in his presence and patting them on the buttocks, (2) in the words of Ciminillo, "stalked" a female graduate student, Dep. p. 23, and physically assaulted her in her home, (3) touched a high school girl on the buttocks then invited her to his office, and (4) at Anderson's request, been the subject of special scheduling and furniture arrangements designed to diminish his opportunity to bother females, and ultimately removed from Anderson's department.

The university's reaction to the incident with the graduate student was to move the student out of Rhea's class, reprimand Rhea, and threaten him with more serious sanctions, including dismissal, if he again engaged in sexual harassment. Not a year went by, and Rhea touched a high-schooler on the buttocks and invited her to his office. Instead of following up on its threat of sanctions more serious than the reprimand, the university altered Rhea's duties, ordered him to get counseling, and told him that the next incident would result in proceedings being initiated to suspend and fire him.

Some might argue that the chief measure taken after the incident with the high school student, the forced counseling, was a weak one in the face of Rhea's demonstrated penchant for sexual harassment, and that the university instead should have fired Rhea or sharply curtailed his contact with students. While the counseling might not have been what everyone would choose or what looks best in hindsight, perhaps it was "plausibly directed toward putting an end to" Rhea's harassment. *Doe,* 138 F.3d at 667. The university, however, did not follow up on its own requirement that it be allowed to monitor Rhea's progress. All the university learned was that Rhea had several counseling sessions; it did not know if his behavior was likely to get better, worse, or stay the same after counseling. This lack of follow-up could in the jury's eyes diminish the usefulness of the university's ordering Rhea to get counseling.

Any doubts about whether a jury question exists are resolved by the university's handling of the 1994 incident when Rhea commented on the "good body" of a student and put his arm around her. This behavior was perhaps arguably less disturbing than the stalking and assault of the graduate student and rump-patting of the high-schooler. Yet it must be taken in the context of what preceded it. In spite of the reprimand, counseling, change of duties, and threat that he would be suspended and fired for the next offense, Rhea again engaged in inappropriate and sexually tinged behavior with a female student. One could argue with some force that the 1994 incident should have shown the university that Rhea did not take the threat of firing seriously, or did not care if he was fired, or was simply unable to control his behavior. Yet through Anderson, the university's response was not to follow up on its threat to fire Rhea, but to do nothing. A jury could properly find that this nonresponse was not "plausibly directed toward putting an end to" Rhea's harassment, *Doe,* 138 F.3d at 667, but instead amounted to condoning Rhea's behavior, *Jones,* 856 F.2d at 992, or to "consciously disregard[ing] an obvious risk that" Rhea would sooner or later harass another student. *Brown,* 117 S.Ct. at 1391–92.

The university stresses that the students who complained about Rhea did not want to pursue their complaints "formally." The Court is unsure what does and does not amount to a "formal" complaint, but the university asserts that for the tenured Rhea to be fired because of harassing students, the students would have had to confront Rhea at a public hearing, which they did not want to do. This argument assumes that the only measure the university could have taken other than those it did was to fire Rhea. A jury could find that the "range of responses," *Doe,* 138 F.3d at 667, available to the university included measures besides firing that could have been effective.

The university also stresses that it weighed Rhea's otherwise solid record in deciding how to handle him. A jury could determine that by the time of the 1994 incident, Rhea's record was considerably tarnished and did not outweigh the threat to students he presented.

The university relies heavily on *Gonzalez v. Ysleta Independent School Dist.,* 996 F.2d 745 (5th Cir.1993). That Fifth Circuit case

involved a male school teacher, who, over the course of four years, had one or more female elementary school students sit on his lap, put his arm around the waist of one girl, and at least put his hand on the waist and possibly stuck his tongue in the ear of another girl. For the first incident, the teacher was orally reprimanded, for the second he was likewise reprimanded and ordered to enter a "general improvement program," and after the third incident he was reprimanded in writing and transferred to another school. *Id.* at 747–49. The second year after the transfer, the teacher put his hand inside a first-grade girl's underwear and touched her genitals. *Id.* at 749.

Overturning a jury verdict, the Fifth Circuit ruled that the school district's reaction to the teacher's conduct up to this fourth incident did not amount to deliberate indifference. *Id.* at 762. It stressed that the district did react to the third incident by officially reprimanding and transferring the teacher. The court acknowledged that these and previous actions had failed to stop the teacher's abuse and were at least negligent. However, it reasoned that the negligence was no more than that and that the district's response had not risen to the level of deliberate indifference. *Id.*

This Court views *Gonzalez* as a close case and is not sure that all other judges would reach the same result. In any event, it is distinguishable. In *Gonzalez,* the school district did mount some reaction to each incident of abuse it learned of, up to and including the incident that most immediately preceded the one that gave rise to the suit. Here, the incident that most immediately preceded the one with Chontos was the 1994 incident, which Anderson learned of and, under one view of the evidence, did nothing about.

Overall, the Court concludes that a reasonable jury could find that the university was deliberately indifferent to Rhea's sexually harassing conduct. Accordingly, summary judgment on the Title IX claim is not appropriate.

Besides the Title IX claim, the university has also moved for summary judgment against Chontos' claim for negligent retention. Chontos asserts that the university negligently retained Rhea after his pattern of harassment emerged.

■■■ Indiana recognizes the tort of negligent retention of an employee by an employer. *Frye v. American Painting Co.,* 642 N.E.2d 995, 998 (Ind.Ct.App.1994). "A master is under a duty to exercise reasonable care to control his servant while acting outside the scope of his employment so as to prevent him from intentionally harming others" where certain conditions are met. *Id.* (quoting Restatement (2d) of Torts, § 317). Among those conditions is that the employer must "know[ ] the employee is in the habit of misconducting himself in a manner dangerous to others." *Briggs v. Finley,* 631 N.E.2d 959, 967 (Ind.Ct.App.1994); *accord Frye,* 642 N.E.2d at 999. The university argues that Rhea was not in the habit of *physically* sexually harassing students before Chontos, but it ignores the incidents where Rhea grabbed and kissed the graduate student, patted students on the buttocks, and put his arm around the student in 1994.

■■■ The university also maintains that Chontos' amended complaint does not clearly set out the claim of negligent retention. True, the complaint could be more clear and specific. Yet it does fairly suggest a claim of negligent retention. *See* Complaint, Ct. 2, ¶¶ 14–15. The university does not say that it needs more discovery to explore the merits of the arguably veiled negligent retention claim, nor that it is otherwise prejudiced by having the claim thrust clearly into play at this point. Overall, Chontos has a viable claim for negligent retention.

■■■ The university complains that Chontos did not comply with the Northern District of Indiana Local Rule 56.1 in responding to the summary judgment motion. As a matter of form, Chontos' response failed to specifically rebut the factual assertions the university made in its fact statement, and thus was deficient. However, in light of the facts and evidence involved in this case, the Court has deemed it most fair and efficient to go ahead and rule on the summary judgment motion by giving Chontos' response full consideration. Chontos' counsel cannot count on such treatment in the future, and would do

best to strictly adhere to Local Rule 56.1 when responding to other summary judgment motions in this district.

█ Finally, there has been some confusion regarding an affidavit. An affidavit of Charles Burns was filed in this Court without any identification as to who filed it or to what motion or matter it might be relevant. The affidavit did not even bear a certificate of service. The Court issued an order striking the affidavit, and instructing the party that had filed it to refile it with proper identification. Defendants have refiled the affidavit, making clear that they first filed it in accordance with an order of the magistrate judge, and the Court has considered it in this ruling.

See also, 20 F.3d 255; 814 F.Supp. 1401.

## CONCLUSION

For the foregoing reasons, Indiana University's Motion for Summary Judgment is DENIED, and the Motion for Leave to File Affidavit of Charles Burns is GRANTED.