**Eugene WILLIAMS, Plaintiff,**

v.

**Lawrence THEZAN and John Fitzsimmons, Defendants.**

**No. 88 C 941.**

United States District Court, N.D. Illinois, E.D.

Jan. 5, 1989.

Roosevelt Thomas, Martin & Thomas, Chicago, Ill., for plaintiff.

Judson H. Miner, Corp. Counsel, City of Chicago by Michael Lieberman, Asst. Corp. Counsel, Chicago, Ill., for defendants.

## ORDER

BUA, District Judge.

In February 1986, a grand jury indicted plaintiff for murder. He remained incarcerated for 21 months until the State of Illinois elected to drop the murder charges against him. Following his release, plaintiff filed this § 1983 action against two detectives with the Chicago Police Department. Plaintiff claims that the grand jury would not have indicted him if defendants had not coerced a third party to make a statement that implicated plaintiff in a murder. Defendants have moved for summary judgment. For the reasons stated herein, this court grants defendants' motion.

## FACTS

At approximately 2:45 a.m. on January 30, 1986, Warren Guardipee was shot and killed with a .38 caliber bullet on the Chicago Transit Authority's Granville Avenue el platform. Shortly thereafter, Chicago police launched an investigation into the Guardipee homicide. The investigation produced no solid leads until the evening of January 31, 1986, when Officers John Francis and Tyrone Roberts arrested Jerry Graham on an unrelated matter. Because Graham claimed to know certain information about the Granville el homicide, Officers Francis and Roberts took Graham's statement on the subject.

In his statement to police, Graham said that he was in Vickie Ruffetti's apartment during the early morning hours of January 30, 1986. At about 3:30 a.m. that morning, Graham heard a loud knock at the back door of the apartment. The impact of the knock broke a pane of glass in the door. When Graham opened the door, he saw Derrick Hamilton (a/k/a "Skeets") and plaintiff Eugene Williams (a/k/a "Blue"). According to Graham, Williams, who was carrying a .38 caliber gun, declared that he and Hamilton had just shot a man at the Granville el station.

After relating his account of the previous day's events, Graham told Officers Francis and Roberts that he knew where Williams and Hamilton could be found that night. Graham stated that Williams was staying at Ruffetti's apartment. In addition, Graham described the clothes Williams was wearing that evening.

Shortly after Graham gave his statement to Officers Francis and Roberts, two other pairs of police officers took turns questioning Graham about the Granville el homicide. Without altering any significant facts, Graham twice repeated his previous statement—first to Officers John McKeone and Terrance Lindahl, then to Sergeant James Brown and Officer Robert Baade. At approximately 2:00 a.m. on February 1, 1986, Officers Francis, Roberts, McKeone, and Lindahl drove with Graham to Ruffetti's apartment. While Roberts stayed in the car with Graham, Francis proceeded to the back door of the apartment, where he noticed a broken window pane in the storm door. Meanwhile, McKeone and Lindahl knocked on the front door of the apartment. Ruffetti answered the door, the officers identified themselves, and she admitted them. In the apartment, the officers saw a man wearing the sort of clothing that Graham had said Williams would be wearing. When the man identified himself

as Eugene Williams, the officers immediately arrested him. As the officers left the apartment building with Williams and Ruffetti, Graham identified Williams to Officer Roberts.

One hour after Williams' arrest, police found and arrested Derrick Hamilton at the location where Graham had said Hamilton would be. At approximately 3:20 a.m. on February 1, 1986, police asked Gary Simmerling to view a lineup that included Hamilton, Williams, Graham, and three other persons. Earlier, Simmerling had told police that shortly after he heard a gunshot at about 2:00 a.m. on January 30, 1986, he saw four men running from the Granville el station. Upon viewing the lineup, Simmerling identified Hamilton and Williams as two of the four men whom he had seen running from the el station. Enoch Ross, who was at the el station when the shooting occurred, also viewed the lineup. Ross identified Hamilton as one of the men whom he had seen fleeing from the el platform shortly after hearing a gunshot.

As part of the ongoing investigation into the Guardipee homicide, Detective Bernard Richter conducted a series of interviews following Williams' arrest. First, Richter spoke with Graham, who reiterated the statement that he had previously given to Officers Francis and Roberts. Then Richter talked to Ruffetti. She stated that she was awakened on the morning of January 30, 1986 by a loud knocking on her back door. According to Ruffetti, her boyfriend, Jerry Graham, opened the back door to admit Hamilton and Williams, at which point Ruffetti went back to sleep. Finally, Richter interviewed Williams and Hamilton. Both men denied involvement in the murder. Williams claimed that at the time of the shooting, he was at his uncle's home in Chicago. This statement conflicted with Williams' previous claim that he was in St. Louis for a funeral when the shooting took place.

When Detective Richter had finished interviewing the suspects, he presented the case to an Assistant State's Attorney, who approved murder charges against Hamilton and Williams on the evening of February 1, 1986. Later that night, Hamilton and Williams appeared in court for their probable cause and bond hearings. The presiding judge found probable cause to arrest the two men. He then set a bond that neither Williams nor Hamilton could post. At that point, officials from the Cook County Sheriff's office took Williams and Hamilton to Cook County Jail.

In the days that followed, the police continued their investigation into the Guardipee homicide. They sought two brothers, Anthony and William Benjamin, for questioning in connection with the murder. Knowing that the police were looking for them, the Benjamin brothers voluntarily came to the police station in the early evening hours of February 7, 1986. At approximately 7:00 p.m. that evening, defendants Lawrence Thezan and John Fitzsimmons, two Chicago police detectives, conducted a lineup that included the Benjamin brothers and four other persons.[1] Enoch Ross, who viewed the lineup, had previously told police that he was at the Granville el station at the time of the shooting when a man approached him and threatened to steal his gym shoes. According to Ross, the man who had accosted him then went up onto the el platform and came running down shortly after the shooting. After viewing the lineup, Ross identified Anthony Benjamin as the man who had threatened to steal his shoes at the Granville el station on January 30, 1986. Detectives Thezan and Fitzsimmons then arrested Anthony Benjamin and released his brother William.

Following the arrest of Anthony Benjamin, Thezan and Fitzsimmons attempted to interview Benjamin, but the suspect refused to talk to the detectives. According to Williams' complaint, Thezan and Fitzsimmons then proceeded to beat Benjamin in an effort to coerce him to implicate

1. Up to that point, Thezan and Fitzsimmons had played a minimal role in the Guardipee case. Their only prior involvement in the investigation occurred on January 31, 1986, when they conducted a lineup that produced no positive identifications. Thezan and Fitzsimmons did not participate in Williams' arrest.

Williams in the murder. (Thezan and Fitzsimmons have repeatedly denied that they ever assaulted or otherwise coerced Benjamin.)

Once the two detectives had completed their interview with Benjamin, Assistant State's Attorney Richard Mottweiler questioned the suspect outside the presence of Thezan and Fitzsimmons. During his interview with Mottweiler, Benjamin dictated and signed a statement implicating himself, Williams, and Hamilton in the Guardipee shooting. Mottweiler then approved murder charges against Anthony Benjamin. Sometime later, Detective Richter spoke with Benjamin. In his conversation with Richter, Benjamin reiterated that he, Williams, and Hamilton had committed the homicide.

On February 24, 1986, the State of Illinois asked a grand jury to indict Eugene Williams, Derrick Hamilton, and Anthony Benjamin for the murder of Warren Guardipee. To support its request for these indictments, the State presented only one witness: Detective Richter. He testified about Ross' identification of Hamilton and Benjamin. Richter also told the grand jury that he had spoken with Anthony Benjamin, and that during this conversation, Benjamin had implicated himself, Williams, and Hamilton in the Guardipee homicide. Based on Richter's testimony, the grand jury returned indictments against Williams, Hamilton, and Benjamin.

As a result of his indictment, Williams remained incarcerated in Cook County Jail for 21 months. On October 19, 1987, the State's Attorney dropped the murder charges against Williams. Consequently, Williams was released from custody. He then filed suit against Detectives Thezan and Fitzsimmons pursuant to 42 U.S.C. § 1983. Williams alleges that Thezan and Fitzsimmons coerced Benjamin to implicate Williams in the homicide. Williams contends that without Benjamin's allegedly coerced statement, the State could not have obtained the indictment that provided the basis for Williams' lengthy incarceration. Proceeding on this theory, Williams claims that defendants' coercive tactics caused his unjust imprisonment, thereby violating his rights under the Fourth, Fifth, and Fourteenth Amendments.

## DISCUSSION

 A plaintiff cannot recover damages in a constitutional tort case where his injury would have occurred even if the defendant had not engaged in the alleged unconstitutional conduct. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Thus, to prevail on his § 1983 claim, Williams must demonstrate that the State could not have procured an indictment against him without proffering the allegedly coerced Benjamin statement to the grand jury. The record in this case, however, indicates that the State could have obtained an indictment against Williams by presenting evidence unrelated to Benjamin's statement. After all, in order to indict Williams, the grand jury merely needed to find probable cause to believe that Williams had committed the homicide. *See Phillips v. Graham,* 86 Ill.2d 274, 284, 56 Ill.Dec. 355, 359, 427 N.E.2d 550, 554 (1981); Ill.Rev.Stat. ch. 38, para. 112–4(d) (1987). Even if Benjamin had never implicated Williams in the murder, the State possessed ample evidence to support a showing of probable cause at the time of Williams' indictment.

For instance, before police took Williams into custody, Jerry Graham's statement had established probable cause to justify Williams' arrest and eventual indictment. Williams claims that the police should have known not to believe Graham. As evidence of Graham's lack of credibility, Williams submits a psychological evaluation form indicating that Graham is a paranoid schizophrenic. This document, however, is unsubstantiated by any sworn affidavit. Moreover, even assuming that Graham has severe psychological problems, Williams offers no evidence that the police knew about these problems or had any other reason to doubt Graham's veracity. In fact, the police had a number of reasons to believe that Graham was telling the truth. For one thing, Graham consistently repeated his

statement several times without altering any significant facts. In addition, before they arrested Williams, the police noted that several facts tended to corroborate Graham's story. Graham had said that he saw Williams with a .38 caliber gun on the morning of the shooting; and a .38 caliber bullet killed Guardipee. Graham had also stated that a knock on the back door of Ruffetti's apartment on January 30, 1986 broke a pane of glass in the door. When police arrived at Ruffetti's apartment on February 1, 1986, one of the officers observed a broken pane of glass in the apartment's back door. Finally, consistent with Graham's statement, police found Williams in Ruffetti's apartment, dressed in the clothing previously described by Graham. Taking all of these corroborating factors into account, the police acted reasonably when they arrested Williams in reliance on Graham's representations. Under the circumstances, Graham's statement would have led "a reasonably prudent person to believe that [Williams] had committed ... a criminal act." *United States v. Cipriano*, 765 F.2d 610, 612 (7th Cir.1985). Therefore, based on Graham's statement, the police had probable cause to arrest Williams.

Following the arrest, the State's case against Williams grew even stronger. While in custody, Williams offered conflicting alibis, further arousing suspicion that he had committed the crime. Meanwhile, subsequent developments lent added credence to Graham's statement. Police arrested Derrick Hamilton at the location where Graham had said Hamilton could be found. In addition, Ruffetti confirmed that Graham had opened the back door of her apartment to admit Williams and Hamilton in the early morning hours of January 30, 1986. Finally, and most importantly, Simmerling positively identified Williams as one of the men whom he had seen running from the scene of the shooting.

Thus, six days before Thezan and Fitzsimmons allegedly coerced Benjamin to implicate Williams in the murder, the State had gathered sufficient evidence to justify Williams' indictment. Admittedly, in presenting the case against Williams to the grand jury, the State elected to rely solely on Benjamin's statement. Nonetheless, if the State's Attorney had discovered that the Benjamin statement was coerced, he could have presented alternative evidence that would have persuaded the grand jury to reach the same conclusion. For example, the State could easily have obtained an indictment against Williams by informing the grand jury about Simmerling's identification of the suspect. In light of this additional evidence, the State would have procured an indictment against Williams with or without the Benjamin statement. Because the grand jury would have indicted Williams anyway, Williams cannot possibly show that defendants' alleged misconduct directly resulted in his indictment and incarceration. Due to Williams' inability to establish a causal connection between defendants' actions and his injury, his § 1983 claim cannot survive.

### CONCLUSION

For the foregoing reasons, this court grants defendants' motion for summary judgment.

IT IS SO ORDERED.