Derrick HAMILTON, Plaintiff,

v.

Lawrence THEZAN and John Fitzsimmons, Defendants.

No. 88 C 794.

United States District Court, N.D. Illinois, E.D.

March 9, 1989.

Alan M. Freedman, Bruce H. Bornstein, Freedman & Bornstein, P.C., Chicago, Daniel T. Coyne, Geary W. Kull, Chicago, Ill., for plaintiff.

Michael Lieberman, Asst. Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Derrick Hamilton ("Hamilton") has sued City of Chicago police officers Lawrence Thezan ("Thezan") and John Fitzsimmons ("Fitzsimmons") under 42 U.S.C. § 1983 ("Section 1983"), alleging the officers had deprived Hamilton of his liberty in violation of the Fourteenth Amendment. Both defendants have moved for summary judgment.[1] For the reasons stated in this memorandum opinion and order, their motion is granted.

### Facts [2]

In the early morning hours of January 30, 1986[3] Warren Guardipee ("Guardipee") was shot and killed on the upper platform of the Granville elevated station ("el station" or simply "el") in Chicago. Detective Bernard Richter ("Richter") was immediately assigned to the investigation, and he proceeded to interview two witnesses.

Enoch Ross ("Ross") told Richter he had been waiting in the Granville el station at ground level when a black male approached him and threatened to take his gym shoes. Then a second black male approached, told the first man not to bother with a "brother" (Ross too was black) and said they should find a white guy. Two more black males then entered the station and all four went upstairs to the platform. Ross heard a gunshot, then saw all four run downstairs and out of the station. On his way out the second man told Ross to get out, then dropped a gun, picked it up and left. Ross went up to the el platform and saw Guardipee lying there.

Gary Simmerling ("Simmerling") told Richter he had been outside the Granville el station when he heard a gunshot. He looked into the station and saw four black males, one of whom picked up a gun, running out of the station.

Simmerling recognized the one with the gun as a member of the Black Gangster Disciples street gang. Based on that information, Simmerling and later Ross were shown photographs of members of that gang. Each identified a photograph of "Reggie Theus" (whose real name was Kelsey Bell) as the man with the gun. However, when Bell was placed in a lineup on January 31, neither witness could make an identification.

On the evening of January 31 an unexpected breakthrough in the Guardipee case came when Jerry Graham ("Graham") was arrested on unrelated charges. Graham, possibly to help his own cause, volunteered information to the police about events of the preceding day. According to Graham, at 3:30 a.m. January 30 he had been in the apartment of his girl friend Vickie Ruffetti ("Ruffetti") when a loud knock on the back door broke a pane of glass.[4] When Graham got to the door he met Hamilton and Eugene Williams ("Williams"), who excitedly said they had just shot a man at the Granville el. Graham later repeated the same story at least three more times. He was also able to tell the police, in the early morning hours of February 1, where Williams and Hamilton could be found.

Based on Graham's information and identification, the police located and arrested Williams (at Ruffetti's apartment) and Hamilton the morning of February 1. Williams and Hamilton were brought to the Area 6 Violent Crimes Office, where Ross and Simmerling identified both as being at the scene of the crime. Ross identified

---

1. Because Hamilton ascribes identical conduct to Thezan and Fitzsimmons, they will simply be grouped as "defendants" throughout this opinion.

2. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable infer-

ence" in the light most favorable to the nonmovant—in this case Hamilton (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)).

3. All further dates also refer to 1986 unless otherwise noted.

4. When the police later visited Ruffetti's apartment, they found a broken window pane in the back door.

Hamilton as the one who said not to bother the "brother," and both Ross and Simmerling identified Hamilton as the one who retrieved the gun while fleeing the station.

Ruffetti was interviewed by Richter and confirmed Graham's story as to the events in her apartment on the morning of January 30. Hamilton, however, told Richter he was at home with his mother at the time of the crime. Mrs. Hamilton would not confirm that story, at least not on February 1.

Based on Richter's interviews and on his own personal interviews with Ross, Simmerling, Graham, Williams and Hamilton, Assistant State's Attorney ("ASA") Roberts ("Roberts") approved murder charges against Williams and Hamilton on February 1. That evening Williams and Hamilton went before a judge on probable cause and bond hearings. Those hearings resulted in findings of probable cause and the setting of a bond ($2 million) that neither suspect could post. Both were taken to Cook County Jail.

On February 7 Anthony Benjamin ("Benjamin") and his brother William came voluntarily to the police station because they knew they were being sought by the police for questioning about the Guardipee murder. At 7 p.m. defendants entered the picture when they conducted a lineup during which Ross identified Benjamin as the one who threatened to take his gym shoes in the el station. Defendants then arrested Benjamin on murder charges. During the ensuing interview they told Benjamin he had been identified in the lineup. They say Benjamin refused to talk to them and no physical beating or coercion took place. Hamilton claims, though, that Benjamin was physically abused by defendants, resulting in a coerced statement implicating Hamilton.[5]

Either way, ASA Mottweiler ("Mottweiler") then interviewed Benjamin outside defendants' presence. Benjamin gave a written statement to Mottweiler, who then approved murder charges against Benjamin. Some time later Benjamin also spoke with Richter. Both Richter and Mottweiler swear Benjamin mentioned nothing about a beating, and Richter did not remember seeing any evidence of such beating (not that he performed any physical examination of Benjamin).

On February 24 Ross and Graham testified before a grand jury on a "John Doe" murder investigation (that is, no indictment was then sought). Later that day Richter testified before the same grand jury on the murder investigation specifically directed against Williams, Hamilton and Benjamin. Richter testified as to Benjamin's statement implicating all three and as to Ross' identification of Hamilton. At that point the grand jury returned a true bill indicting Hamilton and the others.

Some 20 months later (on October 13, 1987) Benjamin recanted his testimony implicating Hamilton (and Williams). Six days later he testified to the grand jury that Calvin Binion had pulled the trigger. At that point the charges against Hamilton were dropped, and he was released nearly 21 months after his initial incarceration.

### Contentions of the Parties

Hamilton charges defendants' unlawful conduct (the asserted coercion of Benjamin) deprived Hamilton of his liberty in violation of the Fourteenth Amendment (Complaint

---

5. Assertedly defendants handcuffed Benjamin's hands and feet and hung him on the back of a door by his handcuffed ankles (Complaint ¶ 10). Each of Thezan and Fitzsimmons has submitted an affidavit specifically denying any striking or other coercion of Benjamin. Hamilton supports his claim only by pointing to a hearsay allegation in Benjamin's motion to suppress his confession (at his criminal trial). Because that and the Complaint allegations are not admissible evidence here, Rule 56(e) would ordinarily doom Hamilton's claim (see *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553). But in this instance Benjamin has not been deposed because he has potential self-incrimination problems. To enable this Court to deal with the present motion, the parties have agreed to proceed on the *assumption* (without defendants having conceded) that Benjamin was coerced. Although that means all bases have not been covered, as should ordinarily be assured on a summary judgment motion, this Court has concurred in that procedure under the circumstances.

¶ 25).[6] His claimed scenario is that defendants did not have sufficient evidence to indict him for murder (*id.* ¶ 13), so they abused Benjamin to coerce him to give a false statement implicating Hamilton (*id.* ¶¶ 11–15). Hamilton also asserts defendants knew Benjamin's statement was false, yet allowed it to be presented to the grand jury.[7]

Defendants' summary judgment motion rests on several grounds:

1. Hamilton has no standing to assert the claimed constitutional violation.

2. Defendants' conduct did not cause any injury to Hamilton because:

(a) Probable cause for his arrest existed on February 1.

(b) No coerced confession was used at any trial.

(c) Hamilton would have been indicted without the Benjamin statement.

3. Even if defendants did cause Hamilton's injury:

(a) Richter's testimony was a superseding cause.

(b) It was not foreseeable that Hamilton would be injured as a result of defendants' alleged coercion of Benjamin.

4. Defendants did not coerce Benjamin, nor were they involved in any statement taken from Benjamin.

5. Defendants are entitled to qualified immunity.

Though any one of those grounds, if successful, might be potentially dispositive here, all will be discussed in turn.

### Standing

Defendants first contend (Mem. 14–17) Hamilton had no standing to assert a violation of Benjamin's Fourth Amendment rights (the allegedly coerced confession). But that is myopic, for what Hamilton complains of is his *own* Fourteenth Amendment right to due process, breached by what he says was an unlawfully procured indictment. Defendants are fortunate that all their contentions are not similarly flawed.

### Causation

Defendants' several arguments as to causation fall into two basic categories:

1. Benjamin's coerced confession was not a "cause in fact" of Hamilton's injury.

2. Even if such a but-for causal relationship did exist, the coerced confession was not a "proximate cause" of the injury.

Defendants may be on doubtful paper on the first proposition, but they are right on the second.

### 1. Cause in Fact

*Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir.1988) (citations omitted) teaches in Section 1983 cases:

> It is also true, as a matter of elementary principles of legal causation that are as applicable to constitutional torts as to common law torts, ... that if [plaintiff] would have been [injured] even if the defendants had behaved properly, then they did not cause his injury and are not liable.

That same causation requirement was put succinctly in *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978):

> [T]he basic purpose of a § 1983 damages award should be to compensate persons

---

**6.** Complaint ¶ 23 alleges defendants' conduct caused Hamilton to be wrongfully arrested. That of course is inherently absurd, for Hamilton was arrested a week before defendants' alleged wrongful conduct! However, Complaint ¶ 24 alleges:

> That defendants beat and tortured Anthony Benjamin to obtain the statement mentioned in paragraph 11 to create a false impression for the grand jury that there was probable cause to indict the plaintiff for murder.

No other claimed constitutional violation is ascribed to defendants, and the parties' memoranda and this opinion have proceeded on that premise.

**7.** As with the asserted coercion-produced Benjamin statements, Hamilton offers no admissible evidence on this score. Once again the assumption as to the former (see n. 5) has to carry with it an assumption as to the truth of the latter.

for injuries caused by the deprivation of constitutional rights.[8]

Defendants seek to make much of the fact that Hamilton was held in custody after a judicial probable cause hearing February 1—before defendants even entered the picture. But that sequence, which of course negates any causal relationship between defendants' allegedly unconstitutional conduct and Hamilton's initial confinement, does not bear on Hamilton's many months in custody *after* the assertedly tainted indictment.

Under the 1970 Illinois Constitution (Ill. Const. art. I, § 7, as implemented by Ill. Rev.Stat. ch. 38, ¶ 111–2) there are alternate routes to criminal felony prosecutions: either the time-honored grand jury indictment or a probable cause hearing followed by the filing of an information. That means Hamilton *could* have been charged with murder after his February 1 probable cause hearing, and hence kept in custody for the same extended 21–month period, entirely without defendants' interposition in his proceedings.

But that was not the route chosen by the prosecutors. Instead they presented the matter to the grand jury for *its* decision—a prosecutorial choice the State's Attorney's office was free to make with or without a prior affirmative judicial finding of probable cause (see *People v. Creque,* 72 Ill.2d 515, 526, 22 Ill.Dec. 403, 407, 382 N.E.2d 793, 797 (1978)). Under those circumstances it simply will not do to speculate that the result *might* have been the same had the other path been followed (see R. Frost, *The Road Not Taken* ). By analogy to *Jones,* 856 F.2d at 994, a police officer who deliberately poisons the well to influence the grand jury's decision to indict cannot thus shield himself from Section 1983 liability.

Nor—at least at the summary judgment stage—can it be said there is no factual issue as to the causal relationship between Benjamin's statement inculpating Hamilton (a statement that for the moment is assumed to have been extorted by defendants' unconstitutional conduct) and the grand jury's decision to indict Hamilton. It is certainly true that the grand jury heard enough to support a probable cause finding, as measured by the judge's earlier determination to the same effect.[9] But that does not, given *Jones,* support a sort of revisionist historical reconstruction as a matter of law. To this extent this Court respectfully disagrees with the decision of its colleague Honorable Nicholas Bua in granting these same defendants summary judgment against Williams on his identically grounded Section 1983 lawsuit (*Williams v. Thezan and Fitzsimmons,* 702 F.Supp. 699 (N.D.Ill.1989))—though this opinion's further analysis leads to the same result reached by Judge Bua, albeit via a different route.

Before this opinion turns to the next topic, it is worth taking note of a related argument defendants might perhaps have made but did not. Another portion of the record tendered on the current motion reflects that Hamilton was also charged with another separate offense—an armed robbery that occurred on December 9, 1985 (Murphy Dep. Ex. 7, at 9). When he was released on the Guardipee murder charge, Hamilton pleaded guilty to the armed robbery and the judge imposed an 18–month probation sentence after giving "credit for the 21 months that you have been in custody awaiting trial on this [armed robbery] charge and the other [murder] charge that has just been dismissed" (*id.* at 7–8). If in fact Hamilton *was* validly in custody on the armed robbery charge, there might truly

---

**8.** [Footnote by this Court] That principle is not at all vitiated by *Carey's* holding (*id.* at 266–67, 98 S.Ct. at 1053–54) that a Section 1983 plaintiff need not prove any injury other than the violation of the constitutional right itself to establish his or her claim (though if that were all a plaintiff could show, only nominal damages would be recoverable).

**9.** Both Graham and Ross told their stories to the grand jury, Ross implicating Hamilton by eyewitness testimony buttressed by his later lineup identification and Graham recounting Williams' statement ("We just popped [shot] a person on the el") when he and Hamilton arrived in the wee morning hours right after the killing. Richter also recounted the Ross story to the grand jury, as well as telling it about Benjamin's confession naming Hamilton too.

have been no causal nexus between the assumed unconstitutional conduct by defendants and Hamilton's deprivation of liberty. But this time the speculation is called for on the other side of the coin, and defendants cannot expect this Court to make their case for them on some sheer guesswork basis.[10]

In any event, defendants cannot prevail as a matter of law on the notion that no causation in fact connected defendants' alleged conduct to Hamilton's lingering in durance vile. It is necessary to continue the analysis.

### 2. *Proximate Cause*

Defendants also urge that even if their conduct was arguably a contributing cause to Hamilton's injury, there were superseding causes that cut off liability. Benjamin's assertedly coerced confession was never presented to the grand jury. Instead Richter testified to the grand jury about a later conversation *he* had with Benjamin.[11]

There is no evidence, even with the required pro-Hamilton inferences, to indicate Richter knew of the alleged coercion. Richter did not mention the Benjamin conversation until he talked to ASA Roberts before the indictment—and it will be recalled Roberts had approved the bringing of the murder charge against Hamilton on February 1, before Benjamin entered the picture at all. Nothing in the record presented to this Court supports a reasonable inference that Roberts knew of any coercion or that the asserted coercion played a role in determining which evidence would go before the grand jury.

More importantly, an integral component of Hamilton's claim is the contention (Complaint ¶ 11) that defendants' motive in abusing Benjamin was to coerce him into implicating Hamilton in the murder—that they

knew the existing evidence was insufficient to obtain a grand jury indictment against Hamilton (*id.* ¶ 13) and knew Benjamin's statement was needed for that purpose (*id.* ¶ 14). But each defendant swears that is not so, that he had no knowledge of that sort at all. There is not a shred of evidence to contravene that perfectly plausible testimony, so *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53 confronts Hamilton with the consequences of a failure of proof on that issue. And it must be emphasized that the issue is *not* one on which Hamilton can excuse his failure of proof on the unavailability of Benjamin's testimony (or on anything else).

*Duncan v. Nelson,* 466 F.2d 939, 942 (7th Cir.1972) held a trial judge's admission of the confession arising from a police officer's unlawful coercive conduct was a superseding cause negating their Section 1983 liability. Although the police officers were "liable for all foreseeable consequences of their acts, including the incarceration" (*id.*), they were presumed to know the extracted confession was inadmissible. Hence the erroneous admission of the unlawful confession was found not foreseeable.

Hamilton contends *Duncan* has been essentially overruled by this pronouncement in *Jones,* 856 F.2d at 994:

> [A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.

*Jones, id.* at 993 (quoting *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961)) rests that conclusion on the same basis as *Duncan:* that in Section

---

**10.** That applies a fortiori to an even more speculative possibility: that the statement by the sentencing judge on the armed robbery charge suggests Hamilton may have suffered no injury because the sentence he would have received for that offense was reduced by the time he spent in jail on the invalid murder charge.

**11.** Oddly enough, Hamilton's counsel devote themselves in part to questioning whether Ben-

jamin really confessed orally to Richter at all, a point they advert to several times (Mem. 3, 4 & n. 1, 13 n. 1). Yet if Benjamin did not do so—if Richter *lied* to the grand jury and if it then returned an indictment on the strength of that lie—Hamilton would seem to have taken *defendants* out of the causation chain entirely by replacing them with Richter. This opinion does not proceed on that premise, however.

1983 cases "a man [is] responsible for the natural consequences of his actions."

But what is significant for this case is not whether the result in *Duncan* would or would not survive *Jones*. Instead the critical factor is that *both* those cases condition Section 1983 liability on the fundamental tort concept of foreseeability. Here there is no evidence to show (or that reasonably implies) that defendants anticipated Benjamin would finger Hamilton, or they knew there was information lacking to obtain a grand jury indictment against Hamilton, or they knew Benjamin had a conversation with Richter, or they knew Richter told Roberts about the conversation with Hamilton, or they knew Roberts had Richter present that conversation to the grand jury—or that they reasonably should have foreseen any of those matters. Nor is there the slightest hint as to why Thezan and Fitzsimmons—officers new to the murder investigation and to whom Hamilton was a total stranger, if they knew of his existence at all—would undertake to torture Benjamin to obtain a statement inculpating Hamilton.

No, even accepting (as this opinion does arguendo) the notion that defendants abused Benjamin, the reasonably foreseeable product of that coercion was a self-incriminatory confession to defendants and to the ASAs to whom Benjamin later spoke —Richter and Mottweiler. Hamilton's script of unconstitutional conduct in which *he* was the target is fanciful, not at all to be inferred reasonably from any evidence placed before this Court. And Rule 56(e) renders Hamilton's Complaint allegations wholly sterile and empty for that purpose.

In sum, Hamilton has not met his burden of showing a material factual issue that it was foreseeable to defendants that their assumed conduct would result in a tainted grand jury indictment against *Hamilton*. That being so, *Jones* as well as *Duncan* teach that Hamilton has failed on the "proximate cause" element necessary to impose Section 1983 liability on defendants.

### Coercion

As stated earlier, defendants stoutly deny any misconduct as to Benjamin.

That, if true, would necessarily destroy the entire underpinning of Hamilton's claim here. But as n. 5 reflects, for current purposes only this Court must accept Hamilton's contrary version of events.

### Qualified Immunity

Defendants are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). *Smart v. Simonson*, 867 F.2d 429, 431 (7th Cir.1989) elaborates:

> Recognizing that the operation of this [*Harlow*] standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified," [*Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034], 3038, 97 L.Ed.2d 523 [ (1987) ], the *Anderson* Court held:
>
> > The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in light of the preexisting law the unlawfulness must be *apparent*.
>
> *Id.* 107 S.Ct. at 3039 (citations omitted) (emphasis added).

Hamilton asserts the obvious: Torturing violates a clearly established constitutional right (*Hensley v. Carey*, 818 F.2d 646, 650 n. 4 (7th Cir.1987)). But *Harlow* and its progeny (including *Anderson*) are clearly framed in terms of the right asserted by the Section 1983 *plaintiff*. What must concern this Court, then, is whether the claimed constitutional right of *Hamilton* (who was not *himself* "tortured") was clearly established on February 24, 1986— the date on which he was indicted.

That question plainly gets a negative answer. What must be looked at for that purpose is the state of the law in 1986 on the type of claim now advanced by Hamilton. For that purpose the analysis will

indulge the leaps of faith that the discussion to this point has shown unjustifiable as a matter of law: It will be assumed that defendants set out to torture Benjamin so that a statement could be extracted from him that would inculpate Hamilton, with defendants intending that this manufactured evidence would be presented to the grand jury to obtain a tainted indictment of Hamilton.

What that scenario highlights is that the impact of defendants' allegedly unconstitutional conduct would visit itself on Hamilton only with the presentation to the grand jury—with the tainted testimony of Richter. In terms of the state of the law in 1986, that brings into play *Briscoe v. La-Hue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983), which held Section 1983 damages were not recoverable from police officers for their testimony—even perjured testimony—as witnesses. *Briscoe, id.* at 329–46, 103 S.Ct. at 1112–21 granted such officers absolute immunity, at least as to their trial testimony.

That holding, if extended to grand jury testimony, would of course immunize Richter. And the same principle has been held to extend to police officers who conspired to bring perjured testimony of other police officers into a trial (*Williams v. Tansey*, 610 F.Supp. 1083, 1085 (E.D.Pa.1985)).

It is true that *Briscoe* left an open question as to whether the immunity would apply to false testimony given at a probable cause hearing (460 U.S. at 329 n. 5, 103 S.Ct. at 1112 n. 5; *id.* at 351 n. 10, 103 S.Ct. at 1124 n. 10 (Marshall, J., dissenting)). But when *Harlow* is at issue, the burden is on the plaintiff to show a clearly established right as of the time defendants assertedly violated that right. It is not enough to spin a possible predicate for liability at that time, or even one that has only now become established. In those terms an admittedly open question before the Supreme Court surely cannot establish a clear violation of a constitutional right. And *Jones*, a 1988 case, even if it *did* later establish clearer contours, is irrelevant to

stigmatize defendants' February 1986 conduct toward Hamilton.[12]

Defendants' conduct thus did not violate any clearly established constitutional right of Hamilton. They are entitled to qualified immunity.

### Conclusion

Even when the unsupported claim of defendants' mistreatment of Benjamin is accepted as true to enable a decision on the current motion, there is no genuine issue of material fact as to other essential elements of Hamilton's claim. As a matter of law:

1. Hamilton has failed to show the necessary proximate cause on his Section 1983 claims against defendants.

2. Defendants also possess qualified immunity against Hamilton's claims.

Defendants are therefore entitled to a judgment as a matter of law. This action is dismissed with prejudice.

---

**12.** That obviates any need to parse *Jones* to see whether it would call for the imposition of

Section 1983 liability on defendants vis-a-vis Hamilton.