Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 6, 2004        Decided April 16, 2004

No. 03-5163

INTERNATIONAL ACTION CENTER, *ET AL.*,
APPELLEES

v.

UNITED STATES OF AMERICA, *ET AL.*,
APPELLEES

ROBERT ATCHESON, *ET AL.*,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00072)

———

*Edward E. Schwab*, Assistant Corporation Counsel, argued the cause and filed the briefs for appellants.

*Carl Messineo* argued the cause for appellees International Action Center, *et al.* With him on the brief was *Mara E.*

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Verheyden–Hilliard. Zachary J. Wolfe* entered an appearance.

Before: EDWARDS, GARLAND, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: Plaintiffs seek to hold police supervisors personally liable for constitutional torts allegedly committed by their subordinates, on two alternate theories: that the supervisors actively participated in the torts, and that the supervisors failed properly to train and supervise the subordinates, in circumstances making it likely that such failure would lead to the tortious conduct. The supervisors seek interlocutory review of the district court's denial of their claim of qualified immunity, but only with respect to the second, inaction theory of liability. We hold that the district court erred in denying qualified immunity on that claim, and accordingly reverse.

## Background

This interlocutory appeal arises out of a suit filed by two organizations and several individuals against the United States, the United States Secret Service, the National Park Service, the District of Columbia, the District of Columbia Metropolitan Police Department (MPD), the Presidential Inaugural Committee, and six individual MPD officers, complaining about law enforcement activities during the 2001 Presidential Inaugural Parade. Plaintiffs are the International Action Center (IAC), described in the complaint as "an unincorporated political association opposed to racism, sexism, oppression of lesbians, gays, bisexuals and transgendered people, war and militarism, and the program of the Bush Administration," and IAC's two co-directors; Justice Action Movement (JAM), described in the complaint as "a multi-issue coalition advocating a political system that gives each person full representation and justice," and three "organizers" for JAM; and several individuals alleged to have been present at the 2001 Presidential Inaugural Parade, including

Elizabeth Ayer and Lowell T. Fletcher. First Am. Compl. at 4–5; Additions to Second Am. Compl. at 2.

As pertinent here, plaintiffs allege that Ayer and Fletcher were "engaged in only lawful, peaceful activity" at the Navy Memorial on Pennsylvania Avenue along the parade route the day of the Inaugural Parade, when "[u]ndercover government agents provocateur" — later identified by plaintiffs as MPD officers Patrick A. Cumba and Jed D. Worrell — "without justification, struck [them] . . . and sprayed a chemical agent into [their] eyes and face[s] at close range." First Am. Compl. at 5; *see* Additions to Second Am. Compl. at 2–4. Cumba and Worrell allegedly also struck other demonstrators and sprayed them with pepper spray, while other uniformed and non-uniformed police officers stood by and watched. Plaintiffs allege that uniformed officers eventually "mock arrest[ed]" Cumba and Worrell, briefly detaining them before releasing them back into the crowd. First Am. Compl. at 3, 19.

Among their various complaints, plaintiffs seek to hold Cumba's and Worrell's supervisors personally liable for money damages under 42 U.S.C. § 1983 for the injuries allegedly inflicted by Cumba and Worrell. Four MPD supervisors were among those sued: Captain Robin Hoey, who commanded the MPD Intelligence Detail "responsible for monitoring events throughout the areas surrounding . . . the parade route," Aff. of Robin Hoey at 1, and three MPD lieutenants — Lorraine Kittrell, Cheryl Pendergast, and Robert Atcheson — each of whom had supervisory responsibilities for the various Intelligence Teams comprising the Intelligence Detail. The MPD supervisors are personally liable, plaintiffs contend, under two alternate theories: (1) what plaintiffs term their "affirmative participation or malfeasance" theory, Appellees' Br. at 8, based on the claim that the supervisors "directed, encouraged, or acquiesced in the unlawful and unconstitutional conduct" of Cumba and Worrell, Additions to Second Am. Compl. ¶ 19, and (2) plaintiffs' "deliberate indifference, or . . . non-feasance" theory, Appellees' Br. at 8, based on the claim that the supervisors "failed to exercise appropriate command authority relating to the

unlawful and unconstitutional conduct of" Cumba and Worrell, Additions to Second Am. Compl. ¶ 18.

The MPD supervisors filed a motion to dismiss or for summary judgment on grounds of qualified immunity. The district court denied the motion. Addressing plaintiffs' theory of affirmative participation, the court noted that the supervisors denied even witnessing the alleged events at the Navy Memorial in person or on surveillance feeds, so "there are clearly material facts in dispute regarding the [MPD supervisors'] affirmative participation in the MPD actions at the Memorial." Mem. op. at 8. As for plaintiffs' theory predicated on the supervisors' inaction rather than affirmative misconduct, the district court defined the question as "whether the [MPD supervisors] had a duty to supervise or train the MPD officers at the Navy Memorial to prevent the alleged First and Fourth Amendment violations." *Id.* The court concluded that plaintiffs could proceed with their inaction claim because they had sufficiently alleged that "it was 'highly likely' given the circumstances at the Navy Memorial . . . that MPD officers would violate citizens' constitutional rights," triggering an obligation on the supervisors to take steps to prevent those violations. *Id.* at 9 (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1261 (D.C. Cir. 1987)).

## Appellate Jurisdiction

The MPD supervisors filed this interlocutory appeal, challenging the district court's denial of their qualified immunity claim. Plaintiffs contend that we should simply remand without considering the supervisors' contentions, because the district court denied qualified immunity with respect to each of the plaintiffs' theories of liability — affirmative participation and inaction — and the supervisors seek review only of the denial on the inaction claim. Appellees' Br. at 10. We accordingly begin by considering whether we have jurisdiction to hear this appeal.

This court has jurisdiction over appeals from "final decisions of the district court[ ]." 28 U.S.C. § 1291. "A denial of summary judgment is ordinarily not 'final,' because it simply

sends a case to trial." *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998). Under the collateral order doctrine, *see Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949), however, we have jurisdiction to hear interlocutory appeals from denials of qualified immunity — "to the extent that [the denial] turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

That last-quoted qualification caused the MPD supervisors to limit their appeal. Noting that the district court had ruled against their assertion of qualified immunity with respect to the "affirmative participation" claim because of the existence of disputed issues of material fact, the supervisors chose not to appeal that aspect of the district court's decision. As the supervisors noted, the Supreme Court in *Johnson v. Jones*, 515 U.S. 304 (1995), held that a defendant may not appeal a district court's order denying summary judgment on qualified immunity "insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 320. This appeal was accordingly limited to the denial of qualified immunity with respect to the inaction claim.

We have jurisdiction to hear the supervisors' limited appeal. In *Behrens v. Pelletier*, 516 U.S. 299, 312 (1996), the Supreme Court explained that "[t]he *Harlow* right to immunity is a right to immunity *from certain claims*, not from litigation in general." The Court emphasized that "when immunity with respect to those claims has been finally denied, appeal must be available, and cannot be foreclosed by the mere addition of other claims to the suit." *Id.*

The Ninth Circuit in *Beier v. City of Lewiston*, 354 F.3d 1058 (9th Cir. 2004), recently determined that it had jurisdiction to hear an appeal from the denial of summary judgment on the ground of qualified immunity for one claim, even though the defendants did not appeal the denial of summary judgment on another claim. Relying on *Behrens*, the court rejected the argument that the defendants could not appeal the denial of qualified immunity as to one claim because they would still have to go to trial on another. The Ninth Circuit

concluded that if this "argument were to prevail, any plaintiff alleging multiple claims arising under a single constitutional provision would be able to circumvent a qualified immunity appeal as long as one of those claims has some merit." *Id.* at 1064. So too here the fact that the qualified immunity claim is not ripe for appeal with respect to the active participation claims should not prevent the MPD supervisors from obtaining prompt review of the denial of qualified immunity as to the inaction claims. *See*, *e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation") (quotation omitted). A contrary approach would lead to what the Supreme Court has termed the "intolerable" result that "[i]f the district court rules erroneously, the qualified-immunity right not to be subjected to pretrial proceedings will be eliminated, so long as the plaintiff has alleged (with or without evidence to back it up) violation of one 'clearly established' right." *Behrens*, 516 U.S. at 312.

## Merits

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In developing the doctrine of qualified immunity, the Supreme Court has sought to strike a balance "between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (quotation omitted). Recognizing that "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery," *Harlow*, 457 U.S. at 817–18, the Court balanced those competing interests by establishing a higher threshold for holding public officials personally liable for constitutional violations. For a public official to be liable for damages, that official must have violated a constitutional right, *and* that right must have been "clearly established" — "[t]he contours of the right must be

sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson*, 483 U.S. at 640; *see id.* at 638 ("qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law' ") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

A court performing a qualified immunity inquiry "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quotation omitted). If the court establishes the violation of a constitutional right, it must then "proceed to determine whether that right was clearly established at the time of the alleged violations." *Id.* (quotation omitted). The Supreme Court has instructed that deciding whether a constitutional right was violated first, rather than asking whether the right was clearly established, "promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Id.*

The validity of the qualified immunity analysis "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson*, 483 U.S. at 639. At the first stage of the inquiry, "courts must not define the relevant constitutional right in overly general terms, lest they strip the qualified immunity defense of all meaning." *Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001). It does no good to allege that police officers violated the right to free speech, and then conclude that the right to free speech has been "clearly established" in this country since 1791. Instead, courts must "define the right to a degree that would allow officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages' . . . ." *Id.* (quoting *Anderson*, 483 U.S. at 639) (alteration in *Butera*).

The district court ruled that the MPD supervisors were not entitled to qualified immunity on plaintiffs' inaction theory because plaintiffs had alleged that "it was 'highly likely,' given the circumstances at the Navy Memorial on January 20, 2001, that the MPD officers would violate citizens' constitutional rights." Mem. op. at 9. This theory of liability was taken

from *Haynesworth*, 820 F.2d at 1261 ("The duty to supervise is triggered by proof that, absent effective supervision, harm was not merely foreseeable, but was highly likely, given the circumstances of the case."); *see also id.* at 1262 (to hold the supervisors liable, plaintiff must show "that a duty to instruct the subordinate to prevent constitutional harm arose from the surrounding circumstances"). But applying a basis for liability at such a level of generality — a duty dependent upon "the circumstances of the case" or arising "from the surrounding circumstances" — is not faithful to the teaching of the Supreme Court in *Anderson* or this court in *Butera*. Defining the duty at issue in *Haynesworth* at a more "appropriate level of specificity," *Butera*, 235 F.3d at 646 (quoting *Wilson*, 526 U.S. at 615) — one that "would allow officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages,' " *id.* (quoting *Anderson*, 483 U.S. at 639) (alteration in *Butera*) — makes clear that the plaintiffs here have not stated a claim against the MPD supervisors for inaction.

The alleged violation in *Haynesworth* was the pursuit of criminal prosecution in retaliation for the filing of civil complaints against the police. The plaintiffs sought to hold the police chief liable because there was "a past practice of retaliatory prosecutions," of which the chief "was or should have been aware," and the chief "failed to supervise or instruct his officers in order to guard against *further* outbreaks of retaliation." *Haynesworth*, 820 F.2d at 1263 (emphasis added). Given the notorious existence of the past practice, it was "highly likely" that retaliatory prosecution would continue, giving rise to "a duty to instruct . . . to prevent constitutional harm." *Id.* at 1261–62. That is what *Haynesworth* meant when it spoke of "circumstances" giving rise to a duty to act. *Id.*

Defining the duty at issue in *Haynesworth* at this greater level of specificity is not meant to suggest that the duty is somehow limited to retaliatory prosecution, and does not embrace other constitutional torts. It instead highlights the fact that the "circumstances" giving rise to the duty to act were grounded in particular past transgressions highly likely to continue in the absence of supervisory action. That under-

standing is reinforced by the *Haynesworth* court's repeated reliance on *Rizzo v. Goode*, 423 U.S. 362 (1976). *See* 820 F.2d at 1262 ("We hold today that the close analogy to *Rizzo* requires us to constrict the ambit of supervisory liability for constitutional wrongs."). As we explained in *Haynesworth*, the Supreme Court in *Rizzo*

> noted that supervisory liability under Section 1983 had important limitations: it required an "affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct." Rejecting the "amorphous proposition[ ]" that the officials implicated shared a "constitutional 'duty' . . . to 'eliminate' future police misconduct," the Court saw no foundation for the asserted liability absent a "showing of direct responsibility" by the supervising official for the infringement.

820 F.2d at 1260 (quoting *Rizzo*, 423 U.S. at 371, 376; footnotes omitted) (alteration and ellipsis in *Haynesworth*).

The MPD supervisors do not seek a ruling on whether they enjoy qualified immunity from a supervisory inaction claim based on past transgressions under *Haynesworth*. Although it is not clear whether plaintiffs even seek to bring such a claim,[1] it is clear that the supervisors have taken any question

---

[1] The complaint does contain allegations that it is the "policy and/or custom of the . . . District of Columbia to disrupt first amendment protected activities," Additions to Second Am. Compl. at 6, but that allegation appears directed more to establishing the liability of the District under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and these "defendants are not causally linked to it." *Rizzo*, 423 U.S. at 375. Plaintiffs do not allege that these supervisors knew or should have known of such a practice, so there is no basis for any allegation that the supervisors had a duty to supervise or instruct subordinates "to guard against *further* outbreaks" of such misconduct. Plaintiffs' more general assertions that mass demonstrations create circumstances leading to confrontation resulting in violations of rights are far too abstract to establish the sort of "affirmative link" or "direct responsibility" on

of immunity from such a claim off the table on this appeal. At oral argument, counsel for the supervisors acknowledged that "there is a point at which past acts may require that supervisors take action," and stated that immunity from such a claim was not being appealed. Oral Argument at 22:53–23:02. What was being appealed, counsel explained, was any effort to base liability on

> a duty to actively supervise and to train without regard to anything, any other aspect, or any prior history. That merely because these four individuals are supervisors, they had an obligation to anticipate that constitutional torts were highly likely and to take steps to prevent them regardless of any other facts in the case.

*Id.* at 26:13–26:44.

Plaintiffs do wish to pursue such a theory of liability. At oral argument, they argued that the duty to supervise arose generally from the potential for constitutional violations, even absent proof that the MPD supervisors had knowledge of a pre-existing pattern of violations by either Cumba or Worrell. Plaintiffs contend that the general duty to supervise "arises in the ordinary course of taking responsibility where the police intervene in the context of mass demonstration activity," Appellees' Br. at 22, because of the "substantial risk" of constitutional violations, *id.* at 17. Plaintiffs also contend that "[t]he duty to supervise does not require proof of a pre-existing pattern of violations." *Id.* at 12, 16. Such a theory represents a significant expansion of *Haynesworth* — one we are unwilling to adopt.

The broad wording of the district court opinion, and its failure to focus on what "circumstances" gave rise to a duty on the part of the supervisors to act, pose the prospect that a claim of the sort described by plaintiffs' counsel could proceed. The district court, in denying qualified immunity on the inaction claim, simply noted that "it is undisputed that the MPD Supervisors were overseeing the activities of many

---

the part of these supervisors that *Haynesworth* held was a necessary prerequisite to liability. 820 F.2d at 1260.

uniformed and plain-clothes MPD officers present at the Navy Memorial for crowd control purposes during the Inaugural Parade and that those officers included . . . Cumba and Worrell," and that plaintiffs "allege that in this context, there could be a substantial risk of violating protestors' free speech or Fourth Amendment rights." Mem. op. at 10. Without focusing on which allegations sufficed to give rise to a claim for supervisory inaction, the court concluded that immunity was not available because plaintiffs "have sufficiently alleged a set of circumstances at the Navy Memorial on January 20, 2001, which did indeed make it 'highly likely' that MPD officers would violate citizens' constitutional rights." *Id.* at 11.

The district court's analysis failed to link the likelihood of particular constitutional violations to any past transgressions, and failed to link these particular supervisors to those past practices or any familiarity with them. In the absence of any such "affirmative links," the supervisors cannot be shown to have the requisite "direct responsibility" or to have given "their authorization or approval of such misconduct," *Rizzo*, 423 U.S. at 371, 376, and the effort to hold them personally liable fades into *respondeat superior* or vicarious liability, clearly barred under Section 1983. *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *accord Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003) ("Section 1983 does not create vicarious or *respondeat superior* liability."); *Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997) ("respondeat superior cannot be used to impose [Section] 1983 liability on a supervisor for the conduct of a subordinate violating a plaintiff's constitutional rights"); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

This court in *Haynesworth* stated that some courts "have also concluded that a duty to supervise may arise, even absent a pattern of past transgressions." 820 F.2d at 1261. In such a case, however, the duty could only exist "where training has been so clearly deficient that some deprivation of rights will *inevitably* result absent additional instruction." *Id.* at 1261–62 (emphasis added). Plaintiffs here made no

allegations that the individual appellants bore any responsibility for the general training of Cumba or Worrell at all, or were in any sense on notice that such training had been so deficient that constitutional violations would "inevitably result."

The question thus reduces to the personal liability of these four individuals for alleged inadequate training and supervision of Cumba and Worrell — in the absence of any claim that these supervisors were responsible for the training received by Cumba and Worrell, or were aware of any demonstrated deficiencies in that training. That leaves inaction liability for supervision, apart from "active participation" (defined to include failure to intervene upon allegedly becoming aware of the tortious conduct) and apart from any duty to act arising from past transgressions highly likely to continue in the absence of supervisory action. Keeping in mind that there can be no *respondeat superior* liability under Section 1983, what is left is plaintiffs' theory that the supervisors' duty to act here arose simply because of "the context of mass demonstration activity." Appellees' Br. at 17, 22. "We have never subscribed to [such an] amorphous proposition[ ], and we decline to do so now." *Rizzo*, 423 U.S. at 376.

We accordingly reject plaintiffs' theory of liability for general inaction, mindful not only of the hazards of reducing the standard for pleading the deprivation of a constitutional right in the qualified immunity context, but also of the degree of fault necessary to implicate supervisory liability under Section 1983. "[W]here responsibility is predicated on inattentiveness rather than affirmative misconduct, the plaintiff must establish a high degree of fault in order to implicate the supervisor in the constitutional infractions of his subordinates." *Haynesworth*, 820 F.2d at 1261. That high degree of fault is not satisfied by a negligence standard; a showing of "mere negligence" is insufficient to state a claim of supervisory liability under Section 1983. *Id.* at 1260; *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986); *see also Davidson v. Cannon*, 474 U.S. 344, 348 (1986) (holding "the protections of the Due Process Clause . . . are just not triggered by lack of due care by [supervisors]"); *Daniels v. Williams*, 474

U.S. 327, 335 (1986) (same). Given "the difficulty of providing meaningful guidance to ward off all possible wrongs," "imposition of a duty of care to prevent all foreseeable misconduct by subordinates would thrust an excessive burden on supervisors and hamper performance of official duties." *Haynesworth*, 820 F.2d at 1261. A supervisor who merely fails to detect and prevent a subordinate's misconduct, therefore, cannot be liable for that misconduct. "The supervisor[ ] must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (Posner, J.).

We conclude that plaintiffs' inaction theory fails to provide an adequate basis for establishing the violation of a constitutional right by these appellants. We hold that absent an allegation that the MPD supervisors had actual or constructive knowledge of past transgressions or that the supervisors were responsible for or aware of "clearly deficient" training, the supervisors did not violate any constitutional right through inaction or failure to supervise. Having found no constitutional violation on the only theory before us, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

\*   \*   \*

We reverse the denial of summary judgment on qualified immunity grounds for the inaction theory of liability, and remand to the district court for further proceedings consistent with this opinion.