**Alice P. BROUDY, et al., Plaintiffs,**

v.

**Susan H. MATHER, et al., Defendants.**

No. CIV.A. 02–2122(GK).

United States District Court, District of Columbia.

March 4, 2005.

David J. Cynamon, Douglas John Rosinski, Shaw Pittman LLP, Washington, DC, for Plaintiffs.

Richard Montague, U.S. Department of Justice Civil Division, Washington, DC, for Defendants.

### MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs represent approximately 220,000 individuals who participated in activities associated with atomic weapons test detonations between 1945 and 1962 in New Mexico, Nevada and various locations in the Pacific Ocean. They also represent

approximately 195,000 individuals who served as occupation forces in Hiroshima and Nagasaki, Japan after World War II in 1945 and 1946. Plaintiffs are collectively referred to herein as "Atomic Veterans."

Defendants, sued in both their individual and official capacities, are Susan H. Mather, the Department of Veterans Affairs ("VA") Chief Public Health and Environmental Hazards Officer; Neil S. Otchin, VA's Clinical Matters Program Chief; Robert H. Roswell, VA's Under Secretary for Health;[1] Steven M. Younger, the Director of the Defense Threat Reduction Agency; D. Michael Schaeffer, the Nuclear Test Personnel Review Program Manager in the Defense Threat Reduction Agency Technology Development Directorate;[2] and other unnamed government officials, employees and contractors. Plaintiffs allege that Defendants have engaged, and continue to engage, in affirmative misconduct which precludes them from presenting evidence to support their claims for service-related death and disability veterans benefits resulting from exposure to radiation from United States atomic detonations, in violation of their rights under the First and Fifth Amendments of access to the courts and to petition to obtain redress for their grievances.

This matter is now before the Court on Defendants' Motion for a Ruling on the Defense of Qualified Immunity or, in the Alternative, for Enlargement of Time in which to Answer the Complaint. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendants' Motion is **granted**.

## I. BACKGROUND[3]

### A. Factual History

Between 1945 and 1962, the United States government ordered approximately 220,000 military and civilian personnel to attend, and clean-up from, atomic weapons test detonations in New Mexico, Nevada and various locations in the Pacific Ocean as part of their military service. Specifically, these individuals were ordered

> to board grossly contaminated naval vessels within a few hours of a nearby underwater atomic detonation; swim and dive in a lagoon so contaminated with radioactive fallout that more than 50 years later it is still unsafe for humans; live and work on ships so grossly contaminated with radioactive material that the vessels had to be sunk in deep water for public safety; lie in open trenches within a few hundred yards of an atomic explosion; charge directly towards and through "ground zero" within minutes of an atomic explosion; conduct extended training in areas contaminated by fallout from dozens of atomic detonations; and fly through ... clouds of radioactive debris within minutes of an atomic detonation.

Compl. ¶ 33. The primary purpose of most of the atomic weapons testing was to

---

1. Defendants Mather, Otchin and Roswell are collectively referred to herein as "VA Defendants."

2. Defendants Younger and Shaeffer are collectively referred to herein as "DTRA Defendants."

3. For purposes of ruling on the instant Motion, the factual allegations of the Complaint must be presumed true and liberally construed in favor of Plaintiffs. *See Crawford–El v. Britton*, 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Int'l Action Center v. United States*, 365 F.3d 20, 24 (D.C.Cir.2004). Therefore, the facts set forth herein are taken from the Complaint or from the undisputed facts presented in the parties' briefs.

study the immediate or short-term impact of atomic warfare on military personnel and equipment. Compl. ¶¶ 28, 30, 35.

In 1945 and 1946, the United States government also ordered approximately 195,000 individuals to serve as occupation forces in Hiroshima and Nagasaki, Japan, where atomic weapons were detonated to end World War II. Compl. ¶ 26. An unknown number of these military personnel were directly or indirectly exposed to dangerous ionizing radiation during their military service. *Id.*

Since at least the time of the first atomic weapons test in 1946, the United States government has been aware that ionizing radiation from atomic explosions is capable of causing severe health effects. Compl. ¶¶ 32, 33. Despite this long-standing awareness, however, the government not only ordered hundreds of thousands of its military and civilian personnel to perform activities which exposed them to high or unknown levels of radiation, but did so giving them little or no information as to the attendant health risks. Compl. ¶ 31. Moreover, what little information the government did provide these individuals greatly underestimated the risks and the potential for long-term adverse health effects. *Id.*

Immediately after the first atomic weapons test in 1946, government officials realized that they had failed to fully anticipate how much radioactive contamination and personnel exposure to ionizing radiation would result from the detonation. Compl. ¶¶ 37–40, 42. Accordingly, the government ordered the creation of special radiological control and safety procedures which required all military personnel who might be exposed to ionizing radiation to wear a radiological monitoring device (i.e., a film badge) at all times. Compl. ¶¶ 72–73. The procedures also required that such personnel undergo special medical tests and physical examinations. The results of these tests were placed in classified "special" medical records and kept separate from the regular military service medical records. Compl. ¶ 44.

On or about August 22, 1951, the Chief of Staff of the Armed Forces Special Weapons Project ("AFSWP") directed that a separate, permanent repository be established for exposure records of personnel participating in atomic weapons testing. The reason stated for collecting these records was "because of possible litigation initiated by personnel" suffering "maladies attributed to exposure of radioactivity" from atomic weapons tests. Compl. ¶ 77.

On June 21, 1956, the Surgeon of the AFSWP reported to the Chief of Staff of the AFSWP that "this headquarters has in its physical possession the sum total of all personal film badges exposed at test operations since and including [the first atomic weapons test in 1946]." Compl. ¶ 83. Plaintiffs charge that the United States government "has never publicly accounted for the whereabouts or disposition" of this information, as well as other information related to radiation exposure, which it possessed and/or controlled in 1956, or subsequently obtained. Compl. ¶ 85.

## B. The Service–Connected Death and Disability VA Compensation Scheme

Congress established an administrative process within VA governing the distribution of benefits for "service-connected" death or disability. *See* 38 U.S.C. §§ 301, *et seq.*. This is the sole legal process available to veterans for obtaining government compensation for injury, illness or death caused by or during military service. Compl. ¶ 88. Pursuant to this process, a claimant for veterans benefits must show a service connection to her injury or illness. *Id.* ¶ 90. "VA has an affirmative duty to

assist claimants in obtaining evidence necessary to substantiate their claims." *Vietnam Veterans of Am., Inc. v. McNamara*, No. 02cv2123 (RC), September 30, 2003 Mem. Op. (*"VVA"*) at 5 (citing 38 U.S.C. § 5103A).

Pursuant to a 1977 memorandum of understanding with VA, the Defense Threat Reduction Agency ("DTRA"), as successor to the Defense Nuclear Agency ("DNA"), provides radiation dose "reconstructions"[4] to VA for use in the adjudication of benefits claims based on exposure to ionizing radiation. Compl. ¶ 95. These reconstructions for Atomic Veterans are performed by the National Test Personnel Review ("NTPR"), located within the DTRA.[5] *Id.* ¶ 96. Defendants Younger and Shaeffer work for the DTRA and the NTPR respectively, and are responsible for preparing the radiation dose reconstructions. Plaintiffs claim that these reconstructions "(1) are based on known incomplete information, (2) ignore other information, including special medical records, in the government's possession and control, and (3) result from models and assumptions that have been demonstrated by independent experts as erroneous and contrary to accepted professional norms." *Id.* ¶ 115.

In the absence of contrary information provided by a claimant, which, Plaintiffs claim, "is practically impossible without access to their dose records and other relevant contemporary information," VA assumes that the DTRA dose reconstructions are correct estimates of service-related radiation exposure, even though "DTRA/DNA has produced widely divergent dose [reconstructions] for the same veterans on separate occasions." *Id.* ¶ 109.

Upon receipt of the DTRA dose reconstruction, the VA Under Secretary for Benefits determines whether it is "at least as likely as not" that the claimant's disease resulted from exposure to radiation in service. *Id.* ¶ 110. In making that determination, the VA Under Secretary for Benefits "may, and generally does, request an advisory opinion from the VA Under Secretary for Health," Defendant Roswell. *Id.* The advisory opinions are generally prepared by Defendants Mather and Otchin, and are "based on assumed radiation exposure thresholds, below which they conclude that radiation cannot cause various diseases." *Id.* ¶ 113. Plaintiffs claim that "[t]he use of such exposure thresholds is contrary to accepted scientific opinion and the practice and procedures of the U.S. Nuclear Regulatory Commission, which is the federal agency generally responsible for protecting the public from radiation health hazards." *Id.*

The VA Under Secretary for Benefits "routinely accepts" the opinion of Defendant Roswell regarding whether it is "at least as likely as not" that the claimant's disease resulted from exposure to radiation in service. *Id.* ¶ 111.

Nine of the ten Plaintiffs named in this action have filed benefits claims which VA has rejected or only partially approved because the government dose reconstruc-

---

4. Radiation dose reconstructions are necessary where contemporaneous exposure records are not available. *See* Compl. ¶ 98.

5. DTRA is an independent agency; however, its Director reports to the Assistant to the Secretary of Defense. *See http:// www.dtra.mil/about/org_chart_org_chart.cfm . .* DTRA is responsible for coordinating the de-

fense of tort actions filed by Atomic Veterans and their survivors against the United States and defense contractors. Compl. ¶ 96. DTRA is also charged with the task of "remain[ing] ready and able to address the present and future [Weapons of Mass Destruction] threat." *See http://www.dtra.mil/about/index.cfm . .*

tion failed to establish service-connection of the condition claimed.[6] *Id.* ¶¶ 117–126.

## C. Procedural History

On October 29, 2002, Plaintiffs filed the instant action seeking declaratory and injunctive relief and compensatory and punitive damages. On October 3, 2003, the Court granted Defendants' motion to dismiss for two reasons. First, the Court held that it lacked subject matter jurisdiction, *see Broudy v. Mather,* No. 02cv2122 (GK), October 3, 2003 Mem. Op. at 8 (*"Broudy I"*), and second, that Plaintiffs had failed to state a valid claim under *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Id.* at 15.

Three days before this Court granted Defendants' motion to dismiss, Judge Rosemary Collyer of this District issued a Memorandum Opinion and Order in *Vietnam Veterans of Am., Inc. v. McNamara,* No. 02cv2123 (RC), September 30, 2003 Mem. Op. (*"VVA"*), finding jurisdiction over the federal officials alleged to have

prevented a class of military veterans from obtaining benefits "by intentionally concealing and covering up, for decades, the evidence" of service-related activities "such that plaintiffs ·cannot prove the connection of their current disabilities to their military service, and therefore cannot receive veterans' benefits." *Id.* at 1.

On August 9, 2004, this Court granted Plaintiffs' motion for reconsideration for two reasons. First, the Court held that its determination that it lacked subject matter jurisdiction was "clear error." *Broudy v. Mather,* 335 F.Supp.2d 1 (D.D.C.2004) (*"Broudy II"*). Second, it held that its "determination that Plaintiffs failed to state a valid *Bivens* claim was also clear error." *Id.* at 5 (internal citation omitted).

## II. ANALYSIS

### A. The VA Defendants and the DTRA Defendants Are Entitled to Absolute Immunity

■ Defendants argue that the Complaint should be dismissed because they are entitled to absolute immunity.[7]

---

6. Kathy J. Jacobovitch is the only named Plaintiff in this action who has failed to file a benefits claim. Compl. ¶ 121.

7. Plaintiffs first argue that Defendants' claim of absolute immunity is precluded, or waived, because it was "not raised in their initial motion to dismiss filed over a year and a half ago." Pl.s' Opp'n at 18. This argument is unconvincing.

The Sixth Circuit, faced with the issue of waiver of the qualified immunity defense at the pleadings stage in *English v. Dyke,* 23 F.3d 1086, 1090 (6th Cir.1994), concluded that "the trial court has discretion to find a waiver if a defendant fails to assert the defense within the time limits set by the court or if the court otherwise finds that a defendant has failed to exercise due diligence or has asserted the defense for dilatory purposes." Both the First and Third Circuits have adopted this position. *See Guzman–Rivera v. Rivera–Cruz,* 98 F.3d 664, 668 (1st Cir.1996) (immunity defense "may be deemed to have

been waived if it is not raised in a diligent manner during the post-discovery, pre-trial ·phase"); *Eddy v. Virgin Islands Water and Power Authority,* 256 F.3d 204, 210 (3rd Cir. 2001) ("[T]he District Court must exercise its discretion and determine whether there was a reasonable modicum of diligence in raising the defense [of immunity]. The District Court must also consider whether the plaintiff has been prejudiced by the delay.").

This issue has not been directly addressed by our Circuit. These cases, however, present a well-reasoned analysis. Applying that analysis to the instant case, it is clear that Defendants have not waived the absolute immunity defense. First, Defendants raised the defense of qualified immunity in their initial motion to dismiss. While it is true that they did not raise the defense of absolute immunity until the instant Motion, the Court cannot say that Defendants failed to exercise a "reasonable modicum of diligence in raising the defense." *Eddy,* 256 F.3d at 210. Second, Plaintiffs

"Where absolute immunity is deemed appropriate, an official is protected from all suits attacking conduct within the scope of the immunity, even if the official is alleged to have acted in bad faith." *Gray v. Poole*, 243 F.3d 572, 575 (D.C.Cir.2001) (citing *Moore v. Valder*, 65 F.3d 189, 194 (D.C.Cir.1995)).

Absolute immunity "flows not from rank or title or 'location within the Government,' but from the nature of the responsibilities of the individual official." *Cleavinger v. Saxner*, 474 U.S. 193, 201, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (quoting *Butz v. Economou*, 438 U.S. 478, 511, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)). Although this form of immunity has traditionally been afforded only to judges, "the [Supreme] Court has extended absolute immunity to certain others who perform functions closely associated with the judicial process."[8] *Cleavinger*, 474 U.S. at 200, 106 S.Ct. 496.

"Accordingly, the 'touchstone' for the doctrine's applicability has been 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.' " *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435–36, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993) (quoting *Burns v. Reed*, 500 U.S. 478, 500, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)). The Supreme Court has instructed lower federal courts to adhere to this "functional approach" in determining the applicability of absolute versus qualified immunity. *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) ("functional approach" looks to "the nature of the function performed, not the identity of the actor who performed it").

■ Moreover, the Supreme Court has "consistently 'emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question. The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.' " *Antoine*, 508 U.S. at 433 n. 4, 113 S.Ct. 2167 (1993) (quoting *Burns*, 500 U.S. at 486–87, 111 S.Ct. 1934). *See Gray v. Poole*, 275 F.3d 1113, 1116 (D.C.Cir.2002) (same). The Supreme Court has also cautioned that it has "been quite sparing in [its] recognition of absolute immunity, and ha[s] refused to extend it any further than its justification would warrant." *Antoine*, 508 U.S. at 433, n. 4, 113 S.Ct. 2167 (quoting *Burns*, 500 U.S. at 486–87, 111 S.Ct. 1934).

■ Our Circuit has "distilled" the Supreme Court's "functional approach"

into a consideration of three main factors: (1) whether the functions of the official in question are comparable to those of a judge; (2) whether the nature of the controversy is intense enough that future harassment or intimidation by litigants is a realistic prospect; and (3) whether the system contains safeguards which are adequate to justify dispensing with private damage suits to control unconstitutional conduct.

*Wagshal v. Foster*, 28 F.3d 1249, 1252 (D.C.Cir.1994) (internal citations omitted).

---

would not be significantly prejudiced by the delay generated by claims of absolute immunity. Moreover, Plaintiffs have had ample opportunity to brief the issue.

8. These include, *inter alia*, hearing examiners employed by administrative agencies, *see Butz*, 438 U.S. at 513–14, 98 S.Ct. 2894; attorneys in the course of activities "intimately associated with the judicial phase of the judicial process," *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); and witnesses who testify in judicial proceedings. *See Briscoe v. LaHue*, 460 U.S. 325, 330–34, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

Applying these factors to the circumstances of the instant case, the Court concludes, keeping in mind the principles just cited, that both the VA and the DTRA Defendants are entitled to absolute immunity.

First, the "judgments" of both the VA and the DTRA Defendants are " 'functional[ly] comparab[le]' to those of judges—that is, . . . they, too, 'exercise a discretionary judgment' as a part of their function." *Antoine*, 508 U.S. at 436, 113 S.Ct. 2167 (quoting *Imbler*, 424 U.S. at 423, n. 20, 96 S.Ct. 984). The process of claims adjudication begins with the DTRA Defendants preparing radiation dose reconstructions for Atomic Veterans, which, by Plaintiffs' own admission, "involves analysis of complicated sets of data" and the making of a "large number of assumptions" and "hypotheses." *Id.* ¶¶ 98, 100. Based on those reconstructions, the VA Defendants advise the VA Under Secretary for Benefits whether it is "at least as likely as not" that the claimant's disease resulted from exposure to radiation in service. Compl. ¶ 113. These functions clearly involve substantial discretion, "a key feature of the tasks sheltered by judicial [i.e., absolute] immunity."[9] *Wagshal*, 28 F.3d at 1252.

Moreover, the tasks Defendants perform are vital to and intimately associated with the VA administrative adjudicatory claims process. While the VA Under Secretary for Benefits makes the ultimate benefits decision, he routinely accepts the advisory opinion of the VA Defendants as to whether it is "at least as likely as not" that the claimant's disease resulted from exposure to radiation in service. Compl. ¶ 111. In short, the function of the VA Defendants is closely analogous to that of extremely high-level "law-clerks"[10] to the Under Secretary for Benefits, just as the function of the DTRA Defendants is closely analogous to that of probation officers who calculate the base offense level and criminal history for consideration of the Sentencing Guidelines by federal judges. Additionally, the opinion of the VA Defendants is based on the radiation dose reconstructions which the DTRA Defendants prepare. *Id.* ¶¶ 110, 113.

Under these circumstances, there can be little doubt that absolute immunity extends to Defendants. *See Sindram v. Suda*, 986 F.2d 1459, 1460 (D.C.Cir.1993) (law clerks are entitled to absolute immunity "for performance of tasks that are an integral part of the judicial process"); *Turner v. Barry*, 856 F.2d 1539, 1541 (D.C.Cir.1988) ("District of Columbia probation officers are absolutely immune from liability for damages in an action brought pursuant to 42 U.S.C. § 1983 for alleged errors in the investigation and preparation of presentence reports."); *Rippy v. Hattaway*, 270 F.3d 416, 422 (6th Cir.2001) ("social workers who initiate proceedings related to the welfare of a child are entitled to absolute immunity while functioning in roles intimately associated with the judicial phase of proceedings") (internal citation omitted); *Gray*, 275 F.3d at 1117 (same); *Mullis v. United States Bankruptcy Court for the Dist. of Nevada*, 828 F.2d 1385, 1390 (9th Cir.1987) ("Court clerks have absolute quasi-judicial immunity from damages for civil

---

**9.** The Court concedes that it would have been helpful to have a fuller, more detailed explanation of the functions Defendants perform in the VA administrative adjudicatory claims process. No further submissions, however, have been made. Significantly, Defendants have never disputed the accuracy of those allegations in the Complaint which describe the VA administrative adjudicatory claims process and the tasks Defendants perform. *See* Def.s' Mot. at 8–10.

**10.** The Court means no disrespect by use of this term. The issue is "function," not level and quality of experience or expertise.

rights violations when they perform tasks that are an integral part of the judicial process.").

The second *Wagshal* factor is also applicable to this case since "[t]he conflicts which federal hearing examiners seek to resolve are every bit as fractious as those which come to court." *Butz*, 438 U.S. at 513, 98 S.Ct. 2894 (internal citation omitted). *See Gray*, 243 F.3d at 576 ("there is 'a serious danger that . . . [a]n individual targeted by an administrative proceeding will react angrily and may seek vengeance in the courts' ") (quoting *Butz*, 438 U.S. at 515, 98 S.Ct. 2894). *See also Wagshal*, 28 F.3d at 1253 ("[c]onduct of pre-trial case evaluation and mediation [ ] seems likely to inspire efforts by disappointed litigants to . . . harass the mediator, in a second forum[, even though] a mediator or case evaluator makes no final adjudication"); *Sindram*, 986 F.2d at 1461 ("disappointed litigants, blocked by the doctrine of absolute immunity from suing the judge directly [may] vent their wrath on clerks"). The grant or denial of disability benefits to veterans is of enormous significance to the individual claimant and therefore "intense enough that future harassment or intimidation by litigants is a realistic prospect." *Wagshal*, 28 F.3d at 1252.

The third *Wagshal* factor, the existence of adequate safeguards to control unconstitutional conduct where absolute immunity is granted, does not appear to support extending absolute immunity to Defendants in this case.[11] Given the fact that the first two *Wagshal* factors strongly support such an extension, however, the Court concludes that extending absolute immunity is fully warranted.

## B. In Any Event, the VA Defendants and the DTRA Defendants Are Entitled to Qualified Immunity

Defendants also argue that the Complaint should be dismissed because they are entitled to qualified immunity.

### 1. The applicable legal standard

Qualified immunity protects government officials " 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Moore v. Hartman*, 388 F.3d 871, 877 (D.C.Cir.2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). *See Int'l Action Center v. United States*, 365 F.3d 20, 24 (D.C.Cir.2004) (same). "Underlying this doctrine is the basic principle of fair notice: officials may be held liable if 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right,' *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); otherwise, the unfairness of holding officials responsible on grounds they could not have anticipated trumps the individual's interest in vindicating transgressed rights." *Moore*, 388 F.3d at 876.

A court facing qualified immunity claims ordinarily engages in a two-step inquiry. *See id.* It must first determine whether, "assuming the truth of the plaintiff's allegations," the plaintiff has alleged the deprivation of an actual constitutional right. *Crawford–El v. Britton*, 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). *See Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("The first inquiry must be whether a constitu-

---

**11.** It would appear that the recently decided case, *Thomas v. Principi*, 394 F.3d 970, (D.C.Cir.), casts doubt upon the vitality of the holding in *Broudy II* that Plaintiffs "can maintain a *Bivens*-type cause of action in the instant case." *Broudy II*, 335 F.Supp.2d at 5.

tional right would have been violated on the facts alleged."); *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (same); *Int'l Action Center*, 365 F.3d at 24 (same).

If the court concludes that a constitutional violation has been alleged, it must then turn to the question of whether the government official is entitled to qualified immunity despite that alleged violation. "The answer depends on whether the right that was transgressed was 'clearly established'—that is, 'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *Groh v. Ramirez*, 540 U.S. 551, 124 S.Ct. 1284, 1293, 157 L.Ed.2d 1068 (2004) (quoting *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151). *See Moore*, 388 F.3d at 876 (citing *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034) (same); *Int'l Action Center*, 365 F.3d at 24–25 (same).

"Because the qualified immunity inquiry focuses on whether the officials could have known what they were doing was unlawful, defining the right 'at the appropriate level of specificity' is critical." *Moore*, 388 F.3d at 875 (quoting *Wilson*, 526 U.S. at 615, 119 S.Ct. 1692). *See Anderson*, 483 U.S. at 639, 107 S.Ct. 3034 (same); *Int'l Action Center*, 365 F.3d at 25 ("At the first stage of the inquiry, courts must not define the relevant constitutional right in overly general terms, lest they strip the qualified immunity defense of all meaning."). "[T]he right can be considered clearly established only if the unlawfulness was 'apparent' in light of pre-existing law." *Moore*, 388 F.3d at 876 (quoting *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034). "The 'salient question,' then, is 'whether the state of the law [at the relevant time] gave [the officials] fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Moore*, 388 F.3d at 876

(quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

**2. Plaintiffs have failed to allege the deprivation of an actual constitutional right**

The Court must first determine whether, assuming the truth of Plaintiffs' allegations, Plaintiffs have alleged the deprivation of an actual constitutional right. In this case, Plaintiffs seek to vindicate their right of meaningful access to the courts. In order to prevail on this claim, our Circuit has held that a plaintiff must allege that defendants "both affirmatively misle[d] [them] *and* [did] so for the very purpose of protecting government officials from suit." *Harbury v. Deutch*, 244 F.3d 956, 957 (D.C.Cir.2001) ("*Harbury II*") (emphasis in original).

■ Defendants argue that, under *Harbury*'s "limited holding," Plaintiffs' allegations "are insufficient to state a claim" because "none of the VA or DTRA defendants' alleged actions involve an affirmative misrepresentation to the plaintiffs designed to prevent them from filing benefits claims based on alleged in-service exposure to ionizing radiation." Def.s' Mot. at 10. This argument is persuasive for two reasons.

First, as Defendants correctly point out, the VA Defendants and the DTRA Defendants "only become involved with the VA claims process *after it has been initiated by the individual claimant* [.]" Def.s' Mot. at 8 (emphasis in original). *See* Compl. ¶¶ 19, 20, 21, 22, 23, 95–116. *Harbury*, however, does not reach post-filing misconduct alleged to have occurred during the actual adjudication of the underlying claim. *See Harbury*, 244 F.3d at 959 (citing, among other cases, *Delew v. Wagner*, 143 F.3d 1219, 1222 (9th Cir.1998) (following the Sixth Circuit and stating that "the Constitution guarantees plaintiffs

the right of meaningful access to the courts, the denial of which is established where a party engages in pre-filing actions which effectively cover[ ]-up evidence and actually render[ ] any state court remedies ineffective"), *Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir.1997) (same)). Rather, it addresses only affirmative misrepresentations that deprive a plaintiff of "any opportunity to seek relief in the courts." *Harbury*, 233 F.3d at 609.

Second, "no claim can be based on [ ][P]laintiffs' repeated insistence that the defendants know that government records contain better information than the allegedly inaccurate and unscientific dose estimates prepared by the DTRA defendants and used by the VA defendants in preparing the Under Secretary for Health's advisory opinions." Def.s' Mot. at 11 (internal citations omitted). *See VVA,* September 30, 2003 Mem. Op. at 13 (dismissing VA defendants on the ground that similar allegations "do[ ] not suffice for purposes of an affirmative act of dissembling or untruth as required by [*Harbury* ]").

Therefore, because Plaintiffs have failed to allege the violation of an actual constitutional right, namely, the right of access to the courts, the VA Defendants and the DTRA Defendants are entitled to qualified immunity.

## III. CONCLUSION

Accordingly, for the foregoing reasons, Defendants' Motion is granted and an Order will issue with this Memorandum Opinion.

The Court has not changed its view that it remains "painfully aware that the conclusions reached in this Opinion may seem profoundly unjust. Plaintiffs have made shocking, inflammatory allegations of reckless and outrageous conduct by the United States government. which gravely injured women and men serving in our armed forces, and then prevented them from obtaining veterans benefits for the injuries caused by that conduct. This Opinion precludes Plaintiffs from litigating their claims in this lawsuit." *Broudy I,* Mem. Op. at 17. At this point, Plaintiffs must look to the Court of Appeals, the Supreme Court or the Congress for relief.